754 A.2d 441

**Vincent DAS**

v.

**Anuradha DAS.**

**No. 2319, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

June 28, 2000.

2

4

Reginald W. Bours, III and David R. Bach, Rockville, for appellant.

Joseph C. Paradiso (Paradiso, Dack, Taub & Oler, P.C., Bethesda and John S. Weaver, Gaithersburg, on the brief), for appellee.

Argued before SALMON, EYLER, and THIEME, JJ.

THIEME, Judge.

The genesis of this appeal arises from the strategic decision of Vincent Das ("Husband") not to attack the suit brought against him by Anuradha Das ("Wife") frontally but on the flank. His strategy is unsuccessful.

The issues that Husband presents to this Court arise from the denial of his motion to vacate a default judgment of absolute divorce entered against him and in favor of his Wife in the Circuit Court for Montgomery County. Husband, who now sojourns in India after spiriting away one of the couple's minor children, filed a subsequent motion to strike this order and requested a hearing. The court addressed his motion by advising counsel that a hearing would be scheduled "on condition that Mr. Das and the minor child, Radha, are present." Husband appeals and asks:

1. Did the trial court abuse its discretion in denying Husband's motion to vacate the order of default?

2. Did the trial court abuse its discretion or deny Husband due process by not granting a continuance of the divorce hearing?

3. Did the trial court err or abuse its discretion in granting Wife an absolute divorce?

We answer "No" to these questions and explain.

### Facts

The parties were married on August 13, 1978, in New Dehli, India. Two children were born of the marriage: Radha, on October 7, 1983, and Jaya, on October 3, 1985.

The parties separated in January 1998, following entry of a domestic violence protective order granted to Wife by the District Court of Montgomery County. The order granted Wife custody of the children, who are minors. Because the order was set to expire on January 10, 1999, the parties entered into an "Interim Agreement," reached during voluntary mediation and designed to preserve the *status quo* for custody and living arrangements, on December 14, 1998. The agreement provided that Husband would not "resume residence in the family home" for three months from December 10, 1998, and would "deliver the children's passports to David S. Goldberg, mediator, for safekeeping."

On January 19, 1999, Wife filed an Emergency Complaint for Custody, which alleged that Husband had undermined her custody of and relationship with Radha in violation of the Interim Agreement and that he had "abused the process to gain possession of his daughter."[1] The court denied this complaint on January 20, after it conferred with counsel. At this time, the parties agreed through counsel that Wife would retain custody of the children.

Notwithstanding the Interim Agreement and subsequent oral custody agreement, Husband fled the country, taking Radha with him, on or about April 16, and went to Japan, following personal service of the Amended Complaint for Absolute Divorce on March 8.[2] Wife neither knew of nor consented to Husband's plans to remove the child from Maryland. In response, Wife filed a second Emergency Complaint

1. The complaint alleged that Husband
 has refused to return the child from visitation, telling the Plaintiff that the child didn't want to come. He has encouraged the child to remain with him in violation of an existing custody agreement between the parties. He has told the Plaintiff at various times that he will bring the child back, but has not done so.
 The complaint then described specific incidents when Husband refused to return Radha to Wife's care at the end of visitation and when he turned Radha against her mother.

2. On January 20, Wife filed her original Complaint for Absolute Divorce, which was never served.

for Custody. The Emergency Complaint stated that "Defendant [fled] to Japan with the minor child on or about April 16, 1999, where he and the child remain at this time." Husband did not oppose this complaint, because, he alleges, neither he nor his attorney were served. The court granted Wife legal and physical custody of the children by an order issued April 30.

Cheryl P. Vural entered an appearance as counsel on Husband's behalf on March 25 and moved to strike Wife's divorce complaint. Neither Husband nor his lawyer, however, appeared for the scheduling conference on April 28, despite the court's notice to husband mailed on March 19. The court denied Husband's Motion to Strike on June 1. Before the period for filing an Answer began, Vural moved to strike her own appearance on May 12, and the court granted her motion without a hearing on June 3. The court immediately mailed Husband Notice to Employ New Counsel.

Husband's residential address before he left the country—and the address used by the court for the divorce proceedings—was 5104 White Flint Drive, Kensington, Maryland 20985. Wife alleges in her opposition to the motion on appeal that Husband continued to pay rent for this apartment home at the time of the post-judgment motions. He used this address on the mediation agreement executed on December 4, 1998, and his own attorney certified in her Motion to Strike Appearance that this address was Husband's "last known mailing address," but she also explained that her "various efforts" to contact her client had been unsuccessful and she had not heard from him since April 13.

Husband was thus without representation at the June 30 hearing on *pendente lite* child support, and Wife testified there that Husband was "to the best of [her] knowledge" in India.[3] The master filed a partial transcript as a report and recommendation, which was sent to Husband at the Kensing-

---

3. The court found that Husband owed child support from the time of the complaint in the amount of $7,146.73.

ton address. Moreover, because Husband did not file an Answer to Wife's Amended Complaint, Wife requested an Order of Default on June 21, which was entered on June 30.[4] The Clerk mailed Husband a Notice of Default Order at the Kensington address.

Concurrent to the custody and divorce actions, a child in need of assistance (CINA) action for Radha was wending its way through the District Court. On May 25, Nancy Karkowsky, Radha's court-appointed attorney, filed a Praecipe notifying that court and the circuit court that, after first being taken to Japan, Radha was now "staying with the father and the family of the father's cousin ... in Chandigarh, India." On June 2, Karkowsky notified the courts in a Second Praecipe of what she believed to be Radha's exact address in New Delhi, India.[5] Information in both notices as to the whereabouts of Husband and Radha came from Husband's father. Copies of these notices were sent to counsel of record for both Husband, *i.e.*, Vural, and Wife.

When the divorce trial began on August 11, Gary Segal, Husband's attorney for employment matters, attended the hearing. He explained that he was "here for Dr. Das," but because he received little notice he was ill-prepared to enter an appearance and undertake full representation. Segal ad-

---

4. Wife had also requested an Order of Default on May 5, which was denied on June 2. The court gave Husband eighteen days in which to file his Answer, dating from June 1. According to the docket, a copy of this order was mailed to Husband, presumably at the Kensington address, on June 3. When no timely Answer was forthcoming, Wife filed a second Request for Order of Default, giving the court Husband's address in Kensington.

5. Karkowsky wrote:

 [Radha's grandfather] informed Ms. Karkowsky that Dr. Das had taken Rahda [*sic*] to New Delhi and that he had asked a former tenant to turn over a key to a home at B–92 East of Kailash, New Delhi, India, to Dr. Das. Ms. Karkowsky inferred that Dr. Das has taken Rahda [*sic*] to that address. The grandfather did not have a telephone number for that address. He assured me that he sent two cables to his son notifying him that it is vital that Rahda [*sic*] meet with her attorney, Ms. Karkowsky, in person before a neglect hearing set for June 2, 1999.

vised the court that, if he were to enter an appearance, he would petition the court for a continuance; however, at the present time, he "[did] not feel that [he] would be capable of properly defending Dr. Das in this matter." The court excused Segal, noting that any request for continuance would be denied, which "is pretty typical in our process today. Under the best of circumstances, cases are not continued. . . ."

At trial, Wife testified that she had been subject to repeated acts of physical and mental cruelty during the marriage. Her brother corroborated this testimony. Husband's father, Badri Das, who had been given power of attorney for Husband's affairs in the United States, sought to give testimony and present documents to the court. The court allowed him to testify as to Husband's and Radha's current locale, which was different from the address Karkowsky provided.[6] The elder Das could not, however, recall their exact address. The court did not allow the father to speak otherwise on behalf of his son,[7] and the testimony of Wife and her brother went untested by cross-examination.

On August 19, the court granted Wife an absolute divorce on the grounds of cruelty and excessively vicious conduct, legal and residential custody of the parties' minor children, child support, use and possession of the family home and family-use personalty, a monetary award, and attorney's fees.

---

**6.** The elder Das testified that his son was living in Tendegal in Panchaula, but he could not provide the exact address.

**7.** The transcript shows that the elder Das believed that power of attorney conferred upon him the right to speak for his son:

MR. DAS: My name is Badri Das. I'm the defendant's father, but he sent me power of attorney, and he sent me some papers to submit to the Court.

THE COURT: Yes. I cannot receive anything from you, sir. Notwithstanding the fact you are his father, you are not his lawyer. He does not have a lawyer. He did not participate in this litigation, so what we call a default has been taken against him—

MR. DAS: Uh-huh.

THE COURT:—and we will proceed today. But I cannot take any papers from you, and you may not represent him in this courtroom.

Husband quickly retained new counsel; however, on October 19, the court denied his Motion to Vacate Order of Default, Stay Entry of Judgment, Permit Filing of Responsive Pleadings, Grant a New Trial and/or Reconsider Award of Custody, and Certain Other Relief. Husband then, on October 26, filed a pleading styled Defendant's Unopposed Motion to Strike Order Dated October 19, 1999, and Set Hearing in Open Court, to which Wife filed opposition. By letter dated November 16, 1999, the court addressed this motion by advising counsel: "I do not believe that there is any requirement that I schedule a hearing on Defendant's Motion to Vacate Order. . . . However, I will agree to schedule a hearing on the condition that Mr. Das and the minor child, Radha, are present." Husband noted a timely appeal on November 24.

## Discussion

### I

### Standard of Review

■ The question of whether this appeal is ripe for our review has troubled us, and we flirted with dismissing it entirely. Husband appeals a judgment that appears not to be final, yet the trial court's response to his most recent motion and ministerial failure to deny this motion leave the parties in a deadlock.

Husband's Motion to Vacate Order of Default was filed eleven days after the Judgment of Absolute Divorce was docketed. Husband's motion was thus a request to revise a final judgment, filed pursuant to the limitations of Maryland Rule 2–535,[8] rather than a motion to alter or amend a non-final judgment filed under the more generous standard of

---

**8.** Maryland Rule 2–535 outlines the trial court's general revisory powers and those for fraud, mistake, irregularity, newly-discovered evidence, or clerical errors. The rule allows revisions for newly discovered evidence and those allowed under Maryland Rule 2–534 to be made within 30 days of the entry of judgment. Revisions for fraud, irregularity or mistake, or to correct clerical errors may be made at any time.

**12**

Maryland Rule 2–534.[9] The instant appeal, at least as framed by the parties, is from the trial court's denial of that motion.

The problem lies with Husband's Unopposed [*sic*] Motion to Strike Order Dated October 19, 1999, and Set Hearing in Open Court, filed but a single day after the docketing of the court's order denying Husband's Motion to Vacate Order of Default. Under Rule 2–534, Husband's diligence in filing this motion within 10 days of judgment stayed the entry of the court's order and this appeal. *Unnamed Atty. v. Attorney Grievance Comm'n*, 303 Md. 473, 486, 494 A.2d 940 (1985) ("[W]hen a motion to alter or amend an otherwise final judgment is filed within ten days after the judgment's entry, the judgment loses its finality for purposes of appeal."); *see also Popham v. State Farm Mut. Ins. Co.*, 333 Md. 136, 634 A.2d 28 (1993). If the trial court had denied this motion when it replied, Husband could have refiled his notice of appeal, and we would now unhesitatingly address the merits. *Unnamed Atty.*, 303 Md. at 486, 494 A.2d 940 (if judgment loses finality under revisory motion, "an order of appeal ... becomes ineffective, and a new order of appeal must be filed after the circuit court disposes of the motion"). The court, however, neither granted nor denied Husband's motion. Instead, it sent by letter the following:

> I have reviewed Defendant's Motion to Strike Order of Court.... I do not believe that there is any requirement that I schedule a hearing on Defendant's Motion to Vacate Order of Default, Stay Entry of Judgment.... However, I will agree to schedule a hearing on the condition that Mr. Das and the minor child, Radha, are present.

---

**9.** Maryland Rule 2–534 gives the trial court broad discretion for re-opening and changing judgments within the first ten days after entry. This rule states:

> In an action decided by the court, on motion of any party filed within ten days after entry of judgment, the court may open the judgment to receive additional evidence, may amend its findings or its statement of reasons for the decision, may set forth additional findings or reasons, may enter new findings or new reasons, may amend the judgment, or may enter a new judgment. A motion to alter or amend a judgment may be joined with a motion for new trial.

In reply, counsel wrote the chancellor, declining to present Husband and his daughter in court because "[t]he issues raised in the motion can be considered in large part on the record ... and involve primarily legal grounds on which Vincent and his daughter are not necessarily witnesses," travel from India "is an expensive proposition," and "Radha is in school, so a trip here could be very disruptive to her education." He also stated:

> Your order dated October 19, 1999, and filed October 26, 1999, denied our motion without a hearing. Unless that order is rescinded, and a hearing on the original motion set, our client must appeal the judgment in this case immediately.

Husband's counsel asked the court below to docket this correspondence and proceeded with this appeal, informing us at oral argument that he considered the Motion to Strike to have been denied. The docket, however, shows Husband's motion as open.

Although Wife does not challenge our jurisdiction, we nevertheless address this point. *Popham*, 333 Md. at 142, 634 A.2d 28 ("Unless an appeal is from a final judgment, the appellate court does not acquire subject matter jurisdiction to review it."). We believe, however, that the motion remains open due to ministerial error rather than efforts by the trial court to retain jurisdiction. Correspondence from Husband's counsel indicated his intent to move forward with this appeal. The court's denial of the Motion to Vacate Order of Default had previously settled the rights of the parties and concluded the cause of action. *Davis v. Davis*, 97 Md.App. 1, 10, 627 A.2d 17 (1993) (holding that final judgment must (1) be intended as an unqualified, final disposition of the matter in controversy, (2) adjudicate or complete adjudication of all claims against all parties, and (3) be recorded by the clerk pursuant to Maryland Rule 2–601) (citing *Rohrbeck v. Rohrbeck*, 318 Md. 28, 41, 566 A.2d 767 (1989), *aff'd*, 335 Md. 699, 646 A.2d 365 (1994)). The court itself acknowledged in correspondence that it owed Husband nothing more on the Motion to Vacate Order of Default. Patently, its offer was an effort to secure the return

of the minor child to Maryland, rather than one to delay finality or appellate review.

Considerations of judicial efficiency also constrain us to entertain this appeal. Between counsel's attempt to cow the trial court into restoring to Husband that which he forfeited and the court's reply, this matter is frozen in time. Husband is unlikely to return to Maryland, for he reasonably believes that he would incur significant liability. *Cf. Popham*, 333 Md. at 142, 634 A.2d 28 ("A judgment is final if it is 'so far final as ... to deny to the party seeking redress by the appeal the means of further prosecuting or defending his rights and interests in the subject matter of the proceeding.'") (quoting *In re Buckler Trusts*, 144 Md. 424, 427, 125 A. 177 (1924)). If we were to remand so that Husband could withdraw his Motion to Strike, he would also take action that is arguably contrary to his interests. *Franzen v. Dubinok*, 290 Md. 65, 427 A.2d 1002 (1981) ("The law of this State is clear that the 'right to an appeal may be lost by acquiescence in, or recognition of, the validity of the decision below from which the appeal is taken or by otherwise taking a position which is inconsistent with the right of appeal.'") (quoting *Rocks v. Brosius*, 241 Md. 612, 630, 217 A.2d 531, 541 (1966)). He is thus unlikely to do so. If we remanded suggesting that the court below deny his motion, we would be shortly faced with the significant family law issues addressed *infra* and, meanwhile, the parties, including Wife, would continue to bear the significant cost of litigation. Our rules and policy, however, disfavor piecemeal appeals. *See, e.g.*, Md. Rule 8–131(a) ("Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal."); *State v. Zimmerman*, 261 Md. 11, 25, 273 A.2d 156 (1971) ("The interest of justice is best served if there are not piecemeal appeals."). By addressing the merits issues now, we encourage their rapid resolution.

That the court below failed in its ministerial duties under Maryland Rule 2–601 (requiring entry, recording, and indexing of judgment) is troubling, but need not be fatal in the circumstances of this case. *Cf. Davis*, 97 Md.App. at 10–11, 627 A.2d 17 (no final judgment existed where clerk entered judgment pursuant to Rule 2–601, but court had not directed such entry of a judgment as defined by Maryland Rule 1–202(n)). Maryland Rule 8–414(a) allows us to correct errors and omissions in the record, and we hereby order pursuant to Rule 8–414(c) that Husband's Motion to Strike be deemed denied as of November 23, 1999, the date that Husband's counsel replied to the court's offer of a hearing. *See Davis*, 97 Md.App. at 12, 627 A.2d 17 (ordering correction of docket entries).

Husband's appeal is from the denial of his Motion to Vacate Order of Default, filed under Maryland Rule 2–535, not from the underlying Judgment of Divorce itself. *In Re: Adoption/Guardianship No. 93321055/CAD*, 344 Md. 458, 475, 687 A.2d 681, *cert. denied sub nom., Clemy P. v. Montgomery Dept. of Soc. Serv.*, 520 U.S. 1267, 117 S.Ct. 2439, 138 L.Ed.2d 199 (1997). Our standard of review here is thus abuse of discretion. *See Wormwood v. Batching Systems, Inc.*, 124 Md.App. 695, 700, 723 A.2d 568 (citing *New Freedom Corp. v. Brown*, 260 Md. 383, 386, 272 A.2d 401 (1971)), *cert. denied*, 354 Md. 113, 729 A.2d 405 (1999). The abuse of discretion standard makes generous allowances for the trial court's reasoning. Abuse of discretion occurs

> "where no reasonable person would take the view adopted by the [trial] court," or when the court acts "without reference to any guiding rules or principles." It has also been said to exist when the ruling under consideration "appears to have been made on untenable grounds," when the ruling is "clearly against the logic and effect of facts and inferences before the court," when the ruling is "clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result," when the ruling is "violative of fact and logic," or when it constitutes an "untenable judicial act that defies reason and works an injustice."

*North v. North,* 102 Md.App. 1, 13–14, 648 A.2d 1025 (1994) (citations omitted). We will not reverse a ruling we review under the abuse of discretion standard simply because we would have made a different ruling had we been sitting as trial judges. Instead, "[t]he real question is whether justice has not been done," and the judgment will be reversed only if "there is a grave reason for doing so." *Wormwood,* 124 Md.App. at 700, 723 A.2d 568.

## II

### Motion to Vacate Order of Default

We hold that the trial court did not abuse its discretion in denying Husband's motion. Marching behind the banner of Maryland Rule 2–535(b) ("On motion of any party filed at any time, the court may exercise revisory power and control over the judgment in case of fraud, mistake, or irregularity."), Husband attacks the trial court's exercise of discretion on three fronts. First, he argues that the judgment should be vacated because Wife's counsel engaged in extrinsic fraud when she requested an Order of Default Judgment using Husband's Kensington address. Second, he claims that the court acted with irregularity when it granted Vural's Motion to Strike Appearance without allowing adequate time for response, as required by Maryland Rule 2–311(b).[10] Third, Husband asserts that he acted with due diligence and good faith in moving to set aside the court's judgment. "A court ... will only exercise its revisory powers if, in addition to a finding of fraud, mistake, or irregularity, the party moving to set aside the enrolled judgment has acted with ordinary

---

**10.** Rule 2–311(b) states in relevant part:

Except as otherwise provided in this section, a party against whom a motion is directed shall file a response within 15 days after being served with the motion, or within the time allowed for a party's original pleading pursuant to Rule 2–321(a), whichever is later.... Maryland Rule 2–321(b)(5), which lists exceptions to Rule 2–321(a), states that "[a] defendant who is served with an original ·pleading outside of the United States shall file an answer within 90 days after being served."

diligence, in good faith, and has a meritorious defense or cause of action." *Tandra S. v. Tyrone W.,* 336 Md. 303, 314, 648 A.2d 439 (1994). We shall parry each prong of Husband's thrust in turn.

## A

### Extrinsic Fraud

Husband argues that the default judgment was procured by extrinsic fraud because Wife's attorney filed both her first and second Requests for Order of Default supplying the court with Husband's Kensington address as his "last known address." In doing so, he argues, she perpetrated fraud on the court, because she had actual knowledge of Husband's address in India, and she thus perpetrated a fraud on the court and prevented Husband from presenting his own favorable evidence.[11] Fraud, however, must be proven by clear and convincing evidence, and, under the instant facts, Husband has not done so. Furthermore, Husband's own actions to evade the reach of the court and eloign his minor child in another land—including his failure to apprise the court of his change of address once this action began—were, in our view, the predominant causes of his inability to put on his case.

The trial court can disturb an enrolled judgment after the thirty-day revisory period only upon a showing of fraud, mistake, irregularity, or the failure of the court to perform a duty required by statute or rule. Md.Code (1974, 1998 Repl. Vol.), § 6–408 of the Courts & Judicial Proceedings Article; *see also* Md. Rule 2–535(b). This rule exists to ensure the finality of judgments, *see Tandra S.,* 336 Md. at 314, 648 A.2d

---

11. Wife contends that Husband did not allege fraud or irregularity in either of his post-trial motions and that we are under no obligation to entertain this issue. *See* Md. Rule 8–131(a) ("Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court...."). Although the words "fraud" and "irregularity" do not appear in Husband's motions, the facts presented there might have allowed the court to infer, albeit after some creative thought, allegations of fraud and irregularity. We thus choose to address these issues.

439 (citing *Andresen v. Andresen,* 317 Md. 380, 387–88, 564 A.2d 399 (1989)), and it applies to all final judgments, including those entered by default. *See Maggin v. Stevens,* 266 Md. 14, 16, 291 A.2d 440 (1972) (citing *Berwyn Fuel & Feed Co. v. Kolb,* 249 Md. 475, 477, 240 A.2d 239 (1968)). The term "fraud" as used in Rule 2–535(b) is "narrowly defined and strictly applied." *Tandra S.,* 336 Md. at 315, 648 A.2d 439. To prevail on a motion to set aside an enrolled judgment, the moving party must show fraud, mistake, or irregularity by clear and convincing evidence. *Id.* at 314, 648 A.2d 439.

■ Maryland courts may vacate an enrolled judgment for extrinsic, but not for intrinsic, fraud. In *Hresko v. Hresko,* 83 Md.App. 228, 574 A.2d 24 (1990), we differentiated between these two forms of fraud:

Intrinsic fraud is defined as "[t]hat which pertains to issues involved in the original action or where acts constituting fraud were, or could have been, litigated therein." Extrinsic fraud, on the other hand, is "[f]raud which is collateral to the issues tried in the case where the judgment is rendered."

Fraud is extrinsic when it actually prevents an adversarial trial. In determining whether or not extrinsic fraud exists, the question is not whether the fraud operated to cause the trier of fact to reach an unjust conclusion, but whether the fraud prevented the actual dispute from being submitted to the fact finder at all.

*Id.* at 232, 574 A.2d 24 (citations omitted) (quoting in part *Black's Law Dictionary* (5th ed.1979)).

■ Intrinsic fraud occurs within the case itself when, for example, a witness perjures himself or a party offers a forged instrument into evidence. *Tandra S.,* 336 Md. at 316, 648 A.2d 439 (citing *Schwartz v. Merchants Mort. Co.,* 272 Md. 305, 308, 322 A.2d 544 (1974)). Even if a perpetrator of intrinsic fraud occasionally succeeds in distorting the truth, our adversarial system is the best hope for ferreting out such deception. On the other hand, extrinsic fraud prevents the

adversarial system from working at all. It involves infirmities such as

> "a false promise of a compromise; or where the defendant never had knowledge of the suit, being kept in ignorance by the acts of the plaintiff; or where an attorney fraudulently or without authority assumes to represent a party and connives at his defeat; or where the attorney regularly employed corruptly sells out his client's interest to the other side,—these, and similar cases which show that there has never been a real contest in the trial or hearing of the case, are reasons for which a new suit may be sustained to set aside and annul the former judgment or decree, and open the case for a new and a fair hearing."

*Id.*, 336 Md. at 316–17, 648 A.2d 439 (quoting *Schwartz*, 272 Md. at 309, 322 A.2d 544) (quoting *United States v. Throckmorton*, 98 U.S. 61, 65–66, 25 L.Ed. 93 (1878)).

Here, Husband fails to establish extrinsic fraud by clear and convincing evidence; instead, the evidence shows that Husband's own failure to keep the court enlightened of his address and his actions to evade the custody orders of the court below caused his misfortunes. To be sure, Wife's attorney had at least some notice, from the Second Praecipe filed by Karkowsky on June 2, of Husband's most recent address before he filed the second Request for Order of Default on June 21. Whether by continuing to use Husband's old address Wife's counsel "set forth that type of intentionally deceptive artifice" calculated to keep him away from court, made a mere record-keeping error, or acted with the understanding that Husband had access to mail sent to his Kensington address is rather nebulous from the facts presented. *See Schwartz*, 272 Md. at 308, 322 A.2d 544.

What is patent, however, is that Husband withdrew from the country—in an apparent attempt to remove a minor child from the jurisdiction of Maryland courts—during ongoing litigation. Our rules on a litigant's duties in the midst of litigation are clear. First, a litigant has a duty to keep himself informed as to the progress of a pending case. *See Penn*

*Cent. Co. v. Buffalo Spring & Equip. Co.*, 260 Md. 576, 581, 273 A.2d 97 (1971); *Tasea Inv. Corp. v. Dale*, 222 Md. 474, 478, 160 A.2d 920 (1960). Second, a litigant has "a continuing obligation to furnish the court with [his] most recent address." *Gruss v. Gruss*, 123 Md.App. 311, 320, 718 A.2d 622 (1998).

It was thus no abuse of discretion for the trial court to find that Husband's wounds were self-inflicted, rather than caused by Wife's alleged artifice. His assertions to the contrary, Husband was well aware that the case was at issue.[12] He was served in Arlington, Virginia, with the Amended Complaint for Absolute Divorce on March 8.[13] He also was notified on March 19 of the Scheduling Conference that he and his attorney later missed. In response to the Amended Complaint, Husband filed a preliminary Motion to Strike under Maryland Rule 2–322(e), because Wife had failed to attach a financial statement to her pleadings. He filed this motion on March 25, within the 60–day period for timely filing his answer or other responsive pleading. *See* Md. Rule 2–321(b)(1) ("A defendant who is served with an original pleading outside of the State but within the United States shall file an answer within 60 days after being served."); *see also* Md. Rule 2–322(e). Husband left the country on or about April 15. Because "[a] civil action is commenced by filing a complaint with a court," Md. Rule 2–101(a), Husband clearly removed himself from the jurisdiction of the court during an ongoing action of which he was duty-bound to stay apprised. Furthermore, he breached his duty to inform the court of his new address, even though he was warned by the court at least once to do so.[14] Unlike the defendant in *Gruss*, which Husband cites with approval, no pleading or paper filed by Husband gives any address other

---

**12.** In the motion on appeal, Husband claims that he "left the United States on or about April 15, 1999, before this case was at issue."

**13.** Husband was served at his mother's residence.

**14.** The Notice to Employ New Counsel advised Husband that he "must inform the Clerk of any change of . . . address."

than the one in Kensington. 123 Md.App. at 320, 718 A.2d 622.

It was reasonable, moreover, for Wife and her attorney to rely on the fact that Husband's Kensington address was the correct one. At the time of service, his address of record was that address. Husband's preliminary Motion to Strike used that address. The letter from Vural to Husband, advising him of her intention to withdraw, and her subsequent Motion to Strike Appearance used that address. Despite Karkowsky's Second Praecipe, docketed on June 2, which inferred that Husband had settled in a family-owned house in New Delhi, the court itself mailed Husband's Notice to Employ New Counsel to that address. Husband might argue with scant credibility that the Clerk's Office should have changed the address of record based on Karkowsky's praecipe, but we think that receiving such third-hand notice did not obligate the court to change a local address of record, where the litigant seemed to be receiving mail, to a rumored address in a remote land. The facts, moreover, in no way support Husband's assertion that, by continuing to use the Kensington address, Wife and her attorney deliberately deceived the court and denied Husband the opportunity to present his case. If Husband could not keep his own father, who held power of attorney, informed of his exact address, how can he reasonably expect his estranged wife to have knowledge of the same?

Neither did the court err when it entered the Order of Default. On June 1, the court denied Husband's Motion to Strike. Under Maryland Rule 2–321(c),[15] Husband's Answer to the Amended Complaint was thus due on June 16, although the court allowed him until June 19. When no Answer was forthcoming, Wife filed a Request for Order of Default on June 21, giving as Husband's "last known address" the Kensington location. *See* Md. Rule 2–613(b). The time for plead-

---

**15.** Rule 2–321(c) states in relevant part: "When a motion is filed pursuant to Rule 2–322, the time for filing an answer is extended without special order to 15 days after entry of the court's order on the motion...."

ing having expired, and upon written request of the plaintiff, the court entered its Order of Default as Rule 2–613(b) requires.[16] *See Carter v. Harris,* 312 Md. 371, 539 A.2d 1127 (1988) (for Rule 2–613, "the word 'shall' is presumed to have a mandatory meaning inconsistent with the exercise of discretion" unless the context indicates otherwise). When Husband failed to move timely for vacation of that order, *see* Md. Rule 2–613(d),[17] the court held a hearing as required by Maryland Rule 9–204 [18] and entered its Judgment of Absolute Divorce on August 19.

The court below, moreover, properly denied Husband's motion to stay that judgment,[19] even though his motion was filed on August 30, within thirty days after its entry. *See* Md. Rule 2–535(a) ("On motion of any party filed within 30 days after entry of judgment, the court may exercise revisory power and control over the judgment and, if the action was tried before the court, may take any action that it could have taken under Rule 2–534."). Rule 2–613(g) expressly provides that default judgments are not subject to the broad revisory powers of Rules 2–534 and 2–535(a) except as to the relief granted. The judge's powers are thus constrained, even during the first thirty days, and the court below did not abuse its discretion by refusing to stay the judgment or revise the relief granted. *See also Banegura v. Taylor,* 312 Md. 609, 619–21, 541 A.2d 969 (1988). Instead, Rule 2–535(b), which

---

**16.** Rule 2–613(b) states:

 If the time for pleading has expired and a defendant has failed to plead as provided by these rules, the court, on written request of the plaintiff, *shall* enter an order of default. The request shall state the last known address of the defendant.

**17.** Rule 2–613(d) states in relevant part: "[T]he defendant may move to vacate the order within 30 days after its entry."

**18.** Rule 9–204 states: "Where a defendant is in default in proceedings for divorce, annulment, or alimony an order of default may be entered pursuant to Rule 2–613. A judgment may be entered pursuant to Rule 2–613(e) only upon testimony."

**19.** Seemingly, pursuant to Rule 2–535(a).

covers motions to vacate for fraud, mistake, and irregularity made after thirty days have passed, provides Husband's only legitimate basis for argument. He has failed to establish at the threshold that Wife and her attorney had defrauded the court below. Rather, it appears that Husband, contrary to his mediation agreement with Wife and in violation of the court's later custody order, scurried from the court's jurisdiction with his minor daughter and played three-card monte with respect to his whereabouts. When it refused to reward such chicanery, the court below exercised sound discretion. We uphold its judgment.

## B

### Motion to Strike Appearance

Husband's second claim is that the court acted with irregularity when it granted the Motion to Strike Appearance filed by Vural. Husband argues that the court failed to allow adequate time for response, as required by Maryland Rule 2–311(b).[20] Because the court file contained information indicating that he was out of the country, Husband contends, and no Answer had been filed, the court should have held a hearing prior to granting Vural's Motion to Strike Appearance, presumably so that he would not have been left without counsel as the deadline for filing the Answer approached. Just as Husband cannot prove extrinsic fraud, he cannot prove irregularity.

Irregularity, like fraud, provides very narrow grounds for revising a final judgment under Rule 2–535(b). *Tandra S.*, 336 Md. at 318, 648 A.2d 439.

---

**20.** Rule 2–311(b) states in relevant part:

Except as otherwise provided in this section, a party against whom a motion is directed shall file a response within 15 days after being served with the motion, or within the time allowed for a party's original pleading pursuant to Rule 2–321(a), whichever is later.... If a party fails to file a response required by this section, the court may proceed to rule on the motion.

Irregularity, as used in Rule 2–535(b), has been defined as "the doing or not doing of that, in the conduct of a suit at law, which, conformable to the practice of the court, ought or ought not to be done." . . .

"[I]rregularity, in the contemplation of the Rule, usually means irregularity of process or procedure . . . and not an error, which in legal parlance, generally connotes a departure from truth or accuracy of which a defendant had notice and could have challenged."

*Id.* (quoting *Weitz v. MacKenzie,* 273 Md. 628, 631, 331 A.2d 291 (1975) (citations omitted)); *see also Hughes v. Beltway Homes,* 276 Md. 382, 388–89, 347 A.2d 837 (1975); *Berwyn Fuel & Feed Co.,* 249 Md. at 479, 240 A.2d 239.

Here, we find no error in the process and procedure of the instant case when the court decided to accept counsel's Motion to Strike Appearance. Maryland Rule 2–132(b) requires that motions for withdrawal that are not made in open court

be accompanied by the client's written consent to the withdrawal or the moving attorney's certificate that notice has been mailed to the client at least five days prior to the filing of the motion, informing the client of the attorney's intention to move for withdrawal and advising the client to have another attorney enter an appearance or to notify the clerk in writing of the client's intention to proceed in proper person. Unless the motion is granted in open court, the court may not order the appearance stricken before the expiration of the time prescribed by Rule 2–311 for responding. The court may deny the motion if withdrawal of the appearance would cause undue delay, prejudice, or injustice.

Under Maryland Rule 2–311(b), the litigant who is served with such a motion "shall file a response within 15 days after being served . . . or within the time allowed for a party's original pleading pursuant to Rule 2–321(a), whichever is later." As required by Rule 2–132(b), Vural sent notice to Husband of her impending withdrawal by letter on April 28, advising him to "immediately obtain alternative counsel and have them enter their appearance on your behalf." After waiting consid-

erably more than five days thereafter, and hearing nothing from Husband, Vural moved the court on May 12, attaching a copy of this letter to her papers to support her statement certifying she had notified him of her withdrawal. The court granted her motion on June 3, more than 18 days after its filing and service.

Husband cites with approval *Ritter v. Danbury*, 15 Md.App. 309, 290 A.2d 173 (1972), in which, he claims, we vacated the judgment of the trial court for refusing to consider a party's request not to permit her counsel to withdraw. *Ritter* is inapposite, however, because Husband misrepresents what transpired in that case. In *Ritter*, Danbury's counsel moved to strike appearance by petition, and his motion had been granted "immediately following the filing of their petition *and consent thereto*," *i.e.*, the client gave his permission to withdraw. *Id.* at 313, 290 A.2d 173 (emphasis added). Ritter appealed and complained that *he* had not been served with notice of the withdrawal of Danbury's counsel. We agreed. In *Ritter*, as here, client consent was a non-issue, because the withdrawing attorney followed the rule for client notification or consent. Moreover, *Ritter's* analysis clarifies the rationale behind the service requirement of Rule 2–132(b) for motions not made in open court: It protects parties to the case *other than* the withdrawing counselor's client. "[E]xcept where a motion to withdraw or strike an appearance is made in open court *in the presence of the other party or his attorney* ... such motion shall be served upon the other party or his attorney...." *Id.* at 313–14, 290 A.2d 173. Thus, once the client has granted consent or the five-day notification period passes, the protective force of Rule 2–132(b) shifts to shield from disadvantage the *other* parties in the case. By not responding to Vural's letter within five days or, as a practical matter, before Vural could file her motion, Husband slept on his rights and lost the opportunity to protest her withdrawal.

For the same reason, Husband was not entitled to a hearing on counsel's attempts to locate him before the court allowed her to withdraw. Rule 2–132 imposes no hearing requirement for motions made by petition.

Moreover, Husband's present contention that he lacked the notice he needed to retain new counsel strains credibility. In the very motion on appeal, Husband claimed to have dismissed Vural:

> During this same time period, Defendant became dissatisfied with the services of Ms. Vural, and sought new counsel. Defendant paid a retainer to Edouard Bouquet, Esquire, and signed pleadings, including an answer to the amended complaint, but was faxing these pleadings from overseas, and did not know why they were never filed.

If his allegations are true, Vural's withdrawal and the court's subsequent Notice to Employ New Counsel were no surprise. In his own words, he "did expect to be represented by new counsel in this case."

Whether or not Vural's withdrawal was expected, however, the duty to stay informed and file pleadings in timely fashion ultimately lay with Husband, and not with his attorney, incumbent or newly retained. In *Banegura*, 312 Md. at 609, 541 A.2d 969, the court refused to find an irregularity when appellant's personal attorney failed to file responsive pleadings because he had not been retained for that particular action, concluding that

> [t]he irregularity suggested by Banegura was the discrepancy that existed between his version of why Burke did not file an answer or timely motion, and the version given by Burke. This is clearly not the type of irregularity contemplated by Rule 2–535(b)....

*Id.* at 621, 541 A.2d 969. Likewise, in the case *sub judice*, any misunderstandings between Husband and Vural or Husband and Bouquet about the filing of the Answer are his responsibility and need not have been considered by the court. *See also Wooddy v. Wooddy*, 256 Md. 440, 454, 261 A.2d 486 (1970) (negligence or mistake of agents or counsel is insufficient to justify striking out an enrolled judgment for fraud or irregularity; party has duty to stay informed). We find no abuse of discretion.

## C

### Diligence and Good Faith

 Husband next asserts that he acted with ordinary diligence and good faith in moving to set aside the court's judgment, the second element that he would have proved had the court exercised its revisory power under Rule 2–535(b).[21] We find no fault with Husband's exercise of diligence. Husband filed his initial Motion to Vacate within two weeks after the final judgment, an impressive feat for a litigant half a world away.

On the side of the equation pertaining to good faith, however, we offer no praise. "The power to set aside a judgment upon motion has been variously described as a power 'incident to all courts of record,' as a power based on 'equitable grounds' and as the exercise of a *quasi* equitable power.'" *Tasea*, 222 Md. at 478, 160 A.2d 920. Yet, he who comes into equity (or *quasi* equity) must have clean hands, and Husband's actions are the mud on his hands that belies any protestations of good faith. He refused to relinquish his minor children's passports, despite his agreement to do so. He fled the jurisdiction of the court to a foreign land, taking with him one of the parties' minor children, of whom he is not the custodial parent. Once abroad, he played a shell game regarding his whereabouts, failing to notify the court, his domestic counsel, and perhaps even his own father of his exact address. Finally, he rejected overtures from the court to entertain oral arguments on his most recent Unopposed [*sic*] Motion to Strike Order of Court Dated October 19, 1999, And Set Hearing in Open Court. In response to Husband's motion, the trial judge—who was under no duty to do so—agreed to schedule a hearing on the condition that Husband and

---

21. Because he appeals from the denial of a motion to vacate an order of default, and not from the underlying judgment, we assume that Husband intends the argument in section III, that the court abused its discretion in granting Wife an absolute divorce, to serve as the third and final leg of his argument for revision under Rule 2–535(b), a meritorious defense.

Radha attend. In reply, Husband's present counsel merely reworked arguments from this appeal, demanded a hearing, and offered tenuous pretexts as to why the two could not be present. As long as Husband remains in India and continues to violate the court's custody order, we shall find no good faith. We affirm the ruling on the trial court on the motion *sub judice.*

## III

### The Continuance

Husband's next two issues on appeal pertain to the Judgment of Absolute Divorce, and not to the post-trial motions. Husband first argues that the trial court abused its discretion and denied him due process by not granting him a continuance at the divorce hearing. Citing *Rutherford v. Rutherford,* 296 Md. 347, 363, 464 A.2d 228 (1983), Husband argues that, because he could have been held in contempt and thereby incarcerated for spiriting Radha away to India, due process requires that he have representation at the divorce hearing. *Rutherford* holds that, under Article 24 of the Maryland Declaration of Rights, which guarantees due process, a right to counsel exists that is broader than that specifically guaranteed by the Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights. Thus, an indigent defendant in a civil contempt proceeding arising from child support arrearages cannot be sentenced to actual incarceration unless counsel has been appointed to represent him or he has waived the right to counsel.[22] *See also Jones v. Johnson,* 73 Md.App. 663, 536 A.2d 116 (1988) (same). Husband also complains that the court abused its discretion when it refused to recognize a general appearance of his counsel for other matters, who attended court on his behalf at the August 11 hearing. Hus-

---

**22.** Husband also argues that Article 24 requires that one have counsel when "disseized of his freehold ... or in any manner ... deprived of ... property," which, he argues, occurs during the division of marital property.

band claims the court denied him due process by "impermissibly ... assuming and concluding on elements of the attorney/client relationship that were outside the scope of its authority and that had not been alleged by Appellant or his counsel." It also, Husband claims, summarily denied him a continuance when Segal and, later, Husband's father requested one. We think Husband pursues the will o' the wisp.

 First, the proceeding in question was a divorce action and nothing more. Had collateral civil contempt proceedings arisen—and the docket shows that they did not—the court would have had opportunity to appoint counsel for Husband if he could not provide his own. To date, however, the threat of incarceration dwells only in Husband's imagination. The right to counsel does not apply to a simple action for divorce.

Second, as for the court's alleged refusal to recognize counsel's appearance, our examination of the transcript shows that it simply did not occur. The transcript does not show that the court tried to prevent attorney Segal from entering an appearance in this matter. It does not show that the court "assumed and concluded" anything beyond that which Segal actually said. Neither does it show that the court summarily denied a continuance; in fact, none was requested.

Instead, Segal—who acknowledged freely that he had been retained primarily for employment matters—voluntarily declined to enter an appearance. He did so because he had been unable to prepare for trial, after he learned that the court would likely deny any continuance he might request. The transcript reveals that Segal was unable to prepare because Husband did not communicate his requirements for representation in a timely fashion:

SEGAL: I am here in a rather strange position in that Dr. Das ... had hired me to handle some other matters pertaining to employment. That was back in March.

We did talk about the fact that there were marital difficulties, but he had indicated to me at that time that things had proceeded smoothly, and nothing was needed of me at that time. . . .

I did not hear from Dr. Das for another month. At that time it was again with regard solely to employment matters. I then heard sometime later that Dr. Das was in Japan. *And yesterday afternoon I received a fax—in the mid-afternoon I received a fax ostensibly from Dr. Das in India asking that I represent him as—to review the file. . . .*

I attempted to contact other attorneys who were listed on the fax, and each one advised me that or the one that I had spoken to said that he had had contact with Dr. Das, but that he had not entered his appearance in this matter. . . .

*I am reluctant . . . to formally enter my appearance* because, as I mentioned to Judge Turner earlier today, in for a dime, in for a dollar, and unfortunately, *I do not feel that I would be capable of properly defending Dr. Das in this matter.*

*I have not seen the file.* . . . [T]he file was in Judge Turner's chambers, which was locked. . . . [Y]esterday afternoon I found out a default was entered, and then speaking with plaintiff's counsel, I found out a few more facts, but *I really do not have everything at hand.*

And again, Your Honor, *if I enter my appearance, it would be to ask this Court to continue the matter.* I realize that puts me in an awkward position and perhaps it puts the Court in an awkward position, but I did want to make it know [*sic*] that I am here for Dr. Das, but have not yet entered my appearance.

THE COURT: Okay, sir. Thank you. Mr. Segal, based on what you have represented on the record, it would appear to me that you have fulfilled any obligation you had to Dr. Das.

And you certainly have fulfilled your obligation professionally to the system and to the Court.

And *if you were to enter your appearance* and to request a continuance, the request for continuance would be denied, and that is pretty typical in our process today. Under the best of circumstances, cases are not continued, but in this case a default was entered against the plaintiff, Dr. Das, by

this Court on June 30, 1999, because he had not participated in or answered an amended complaint.

And certainly your dealings with him as you have represented indicate clearly that he did not keep you informed and did not give you all the information you, as a professional, would need to know to represent a client. So you are excused, and I appreciate what you have represented on the record.

As for a request for continuance from Husband's father, the transcript shows that none was made. Instead, the court denied the elder Das the right to represent his son because he was not an attorney. The father served only as a witness who addressed Husband's whereabouts.

Even if Segal or Badri Das had requested a continuance, and the court had summarily denied it, such denial would have been proper. "[W]hether to grant a continuance is in the sound discretion of the trial court, and unless [the court] acts arbitrarily in the exercise of that discretion, his action will not be reviewed on appeal." *Thanos v. Mitchell*, 220 Md. 389, 392, 152 A.2d 833 (1959); *see also* Md. Rule 2–508(a) ("On motion of any party or on its own initiative, the court may continue a trial or other proceeding as justice may require."). "Under Rule 2–508, the trial court has wide latitude in determining whether to grant a continuance." *Shpak v. Schertle*, 97 Md.App. 207, 225, 629 A.2d 763 (1993). Reversal on appeal thus occurs only in "exceptional instances where there was prejudicial error." *Thanos*, 220 Md. at 392, 152 A.2d 833.

The case *sub judice* is not one of those exceptional instances. Husband was already in default. He had not taken timely steps to vacate the Order of Default. As the court indicated, Segal's attendance and remarks gave the court no basis sufficient for staying the course of events already proceeding in orderly fashion. Indeed, Segal's personal account of Husband's case management brought to light again the extent of Husband's nonfeasance, providing additional justification for the Order of Default. Our reading of *Abrams v. Gay Investment Co.*, 253 Md. 121, 251 A.2d 876 (1969), even though it is

not precisely on point, reinforces our view that Husband's request for continuance, even if made, would lack the gravity to merit appellate review. In *Abrams,* the Court of Appeals affirmed the decision of a trial court not to set aside default judgment in an action during which appellant had sought a continuance. Appellant had dismissed her counsel, and she subsequently failed to follow the proper procedure in requesting a continuance from the court, even though court personnel advised her of that procedure. *Id.* at 123–24, 251 A.2d 876. Likewise, at the August 11 hearing, neither Segal nor Badri Das made a proper motion for continuance pursuant to Rule 2–508(a). If they had, the court would not have abused its broad discretion by denying such motion.

## IV

### The Divorce

Finally, Husband asks if the trial court erred or abused its discretion in granting Wife an absolute divorce. He argues that the facts alleged by Wife at the August 11 hearing do not support grounds for divorce based on either cruelty or excessively vicious conduct because they lack sufficient specificity and fail to reach the level of egregiousness described in some of our older cases. He also claims that Wife's testimony was uncorroborated. We disagree.

Whether the events that bring a divorce complainant to court constitute cruelty or excessively vicious conduct has never been the stuff of which bright line rules are made, and even now our standards are shifting. Only recently, in 1998, did the legislature make cruelty and excessively vicious conduct grounds for absolute divorce in Maryland. *See* Md.Code (1984, 1999 Repl.Vol.), § 7–103(a)(7) & (8) of the Family Law Article (codifying 1998 Md. Laws 349 & 350). Before that time, cruelty of treatment gave grounds for limited divorce only, a rule that originated in English ecclesiastical courts. Because divorce itself was disfavored by the church, the rule existed only to protect the victim-party from further and more serious physical harm. "The cruelty which entitles the injured

party to a divorce ... consists in that sort of conduct which endangers the life or health of the complainant, and renders cohabitation unsafe." *Harris v. Harris*, 161 Eng. Rep. 697 (1813). Maryland adopted this English rule, as the Court of Appeals explained in *Scheinin v. Scheinin*, 200 Md. 282, 288, 89 A.2d 609 (1952) ("In 1851 Chancellor Johnson announced in the High Court of Chancery that the words 'cruelty of treatment' as contained in the Maryland divorce statute would be given the same interpretation as given to them by the English Ecclesiastical Courts.") (citations omitted). The English rule, as articulated in *Scheinin* and older cases, was for many years our gold standard, setting the parameters for what constituted cruelty:

> Ordinarily a single act of violence slight in character does not constitute cruelty of treatment as a cause for divorce. But it is now accepted in Maryland, as well as generally throughout the country, that a single act may be sufficient to constitute the basis for a divorce on the ground of cruelty, if it indicates an intention to do serious bodily harm or is of such a character as to threaten serious danger in the future.

*Id.* at 288–89, 89 A.2d 609 (citations omitted).

The Court in *Scheinin*, however, went on to point out that the original definition of "cruelty" had grown more broad, to encompass mental as well as physical abuse:

> It is now accepted that cruelty as a cause for divorce includes any conduct on the part of the husband or wife which is calculated to seriously impair the health or permanently destroy the happiness of the other. Thus any misconduct of a husband that endangers, or creates a reasonable apprehension that it will endanger, the wife's safety or health to a degree rendering it physically or mentally impracticable for her to properly discharge the marital duties constitutes cruelty within the meaning of the divorce statute.

*Id.* at 289–90, 89 A.2d 609 (citations omitted). Even under this more modern definition, the cases for limited divorce on

grounds of cruelty and excessively vicious conduct—there are no reported cases for absolute divorce on these grounds—show remarkable tolerance for abusive behavior. "[A] divorce cannot be granted on the ground of cruelty of treatment merely because the parties have lived together unhappily as a result of unruly tempers and marital wranglings.... [M]arital neglect, rudeness of manner, and the use of profane and abusive language do not constitute cruelty." *Id.* at 288, 89 A.2d 609 (citations omitted); *see also Harrison v. Harrison,* 223 Md. 422, 426, 164 A.2d 901 (1960) (where husband struck wife and gave her a black eye, a "single act of violence complained of by appellee does not measure up to what the law of this State requires for a showing of cruelty ... [or justify] the wife's living apart from her husband"); *Bonwit v. Bonwit,* 169 Md. 189, 193, 181 A. 237 (1935) (husband's "violent outbursts of temper, accompanied in some instances by ... slapping" wife did not constitute cruelty); *McKane v. McKane,* 152 Md. 515, 519–20, 137 A. 288 (1927) (husband's "spells," caused by drinking, during which he called wife vile names, implied unchastity on her part, cursed her, pouted, and refused to eat did not constitute cruelty); *Short v. Short,* 151 Md. 444, 446, 135 A. 176 (1926) ("Marital neglect, indifference, a failure to provide as freely as the wife may desire in dress or in conveniences, sallies of passion, harshness, rudeness, and the use of profane and abusive language towards her are not sufficient, if not in manner and degree endangering her personal security or health.") (citing *Childs v. Childs,* 49 Md. 509, 514 (1878)); *Neff v. Neff,* 13 Md.App. 128, 132, 281 A.2d 556 (1971) (single incident of violence and continued verbal abuse insufficient grounds for divorce because "[i]t does not appear from the evidence presented that appellant was in such fear for her health and safety"); *Galvagna v. Galvagna,* 10 Md. App. 697, 702, 272 A.2d 89 (1971) (where husband struck wife once, and used an open hand rather than his fist, there was insufficient evidence of cruelty). On the other hand, the Court of Appeals upheld a limited divorce on grounds of cruelty where it appeared that one party had been in significant peril,

*e.g.,* incidents of drunken rage and physical abuse that required the wife to seek police intervention and seek refuge with relatives. *See Hilbert v. Hilbert,* 168 Md. 364, 370–75, 177 A. 914 (1935).

In reviewing these oft-cited cases on cruelty and excessively vicious conduct, we note that most are quite old and give victims little relief from their aggressive partners by modern standards. In part, we believe, the courts' reluctance to grant relief stems from the fact that cruelty and excessively vicious conduct were grounds for limited and not for absolute divorce, and Maryland courts have historically disfavored divorce from bed and board. *See, e.g., Bonwit,* 169 Md. at 194, 181 A. 237 ("[T]he policy of the law of this state looks with disfavor upon divorces *a mensa et thoro* .... 'It is not the function of the courts ... to arbitrate family quarrels, but to determine upon the evidence whether either of the parties has been guilty of such conduct as would make a continuance of the marital relation inconsistent with the health, self-respect, and reasonable comfort of the other.' ") (quoting *Singewald v. Singewald,* 165 Md. 136, 146, 166 A. 441 (1933)); *Porter v. Porter,* 168 Md. 296, 305, 177 A. 464 (1935) ("[T]he law of this state is not favorable to divorces *a mensa et thoro,* and they will not be granted except for grave and weighty causes, and even then the evidence must be clear and the corroboration satisfactory and in accordance with the law.... 'Parties to the marriage must realize that the relationship is seldom perfect, and that it is essential to the happiness and contentment of the parties, as well as for the benefit of society, that each tolerate inconveniences, annoyances, even hardships, and make sacrifices for the common welfare.' ") (quoting *McClees v. McClees,* 160 Md. 115, 120, 152 A. 901 (1931)). Disapproval of limited divorce likely colored past analysis in the cases where cruelty or excessively vicious conduct was alleged.

In more recent years, however, a greater awareness and intolerance of domestic violence has shifted our public policy toward allowing the dissolution of marriages with a violence

element.[23] In the courts, we have responded to this trend by permitting absolute divorce on grounds of constructive desertion, a doctrine far friendlier to victims of violence in terms of the quality of proof required to grant freedom from the shackles of an abusive spouse.[24] Likewise, the General Assembly responded in 1980 by enacting the domestic violence statute, Md.Code (1984, 1999 Repl.Vol., 1999 Cum.Supp.), §§ 4–501 through 4–516 of the Family Law Article, which grants Maryland courts the power to issue civil protective orders and offers various forms of relief to victims. In 1998, as part of its continuing modernization of our family law, the legislature acknowledged that persons subject to domestic abuse should be entitled to seek absolute divorce immediately without a waiting period prior to the filing of a complaint. It thus expanded the grounds for absolute divorce to include cruelty and excessively vicious conduct. John F. Fader II & Richard J. Gilbert, *Maryland Family Law* § 3–2(a) (2d ed. 1999 Cum.Supp.).

---

**23.** The problem of domestic abuse ... remained largely ignored by our society until the last two decades, when national efforts toward legal and social reform began to surface. Since then, domestic abuse has gained widespread public attention. Social service agencies developed battered women's shelters and hotlines, and state legislatures recognized that domestic violence needed to be adequately addressed.
*Coburn v. Coburn*, 342 Md. 244, 251, 674 A.2d 951 (1996) (citations omitted).

**24.** Even when behavior does not rise to the level of cruelty or excessively vicious conduct, our courts have long ended violent marriages on grounds of constructive desertion. "It is accepted that any conduct of a husband that renders the marital relation intolerable and compels the wife to leave him may justify a divorce on the ground of constructive desertion, even though the conduct may not justify a divorce on the ground of cruelty." *Scheinin*, 200 Md. at 290, 89 A.2d 609 (citing *Sullivan v. Sullivan*, 199 Md. 594, 601, 87 A.2d 604 (1952)); *see also Painter v. Painter*, 113 Md.App. 504, 529, 688 A.2d 479 (1997) ("Due to the seriousness of the problem of domestic violence in our society and the extreme example of domestic violence contained in this case, we commit this case to the reporter in order that the facts contained herein may be preserved as examples of the seriousness of this, all too frequent, recurring problem and to again emphasize that a woman is not required to be a homicide victim in order to establish the elements of constructive desertion.").

In the courts, we are now left holding a stack of cases—all "good law"—dating from the 1920's that no longer square with our modern understanding of appropriate family interaction. Verbal and physical abuse may have been tolerated in another era, and our predecessors at bar may have placed the continuity of the marital bond above the well-being of individual participants, but our values are different today. Indeed, in the 1999 supplement to their classic treatise on Maryland Family Law, authors John F. Fader II and Richard J. Gilbert correctly opine that we "are probably going to have a difficult time reconciling the statutory mandate to give relief to the abused individual with some of the case decisions of the past." *See* Fader & Gilbert, *supra* § 3–2(a).

Against this background, we turn to the instant case. Husband claims that his conduct toward Wife never "endangered her life, person, or health, or would have otherwise caused her to feel apprehension of bodily suffering," and, to be sure, during her brief time on the witness stand on August 11, Wife did not account for the particulars of specific violent incidents. Nevertheless, from Wife's direct testimony and in the pleadings, the court below learned that the history of violence between Husband and Wife justified entry of a one-year protective order in January 1998, after a particularly violent incident that was "one in several cases of domestic violence." [25] Wife went on to testify that the parties' marriage

---

25. Wife testified that she filed for the order

because my husband assaulted me on the night of January the 5 th, and as a result, the police came to the house. And at that point, the officer taking the report advised me as to how I could proceed because he could see that the situation was not good, and I had been hit, and he advised me how to go to District Court or Circuit Court in order to get an ex parte order which was then subsequently followed by a protective order for one year.

We note that Husband is highly critical of Wife's account of this event, because Wife "never testified [he] actually struck her.... [Wife's] testimony about what the officer saw is hearsay ... [and t]he record gives absolutely no indication of where said incident allegedly occurred .... where on her body she was allegedly struck ... [and] whether [Husband] allegedly used a hand, foot, or anything else." Husband's contentions defy reason. For the District Court to have granted a one-

was an arranged marriage, which "in our culture ... the way it is conducted is basically subservience." She spoke of ongoing cruelty, including "making me stay up all night in order to listen to him, isolating me from my friends and from my family, and not allowing contact as much as possible.... [H]itting, pinching, pulling hair, etc." Wife testified in some detail how husband's controlling behavior harmed her previously close relationship with her family.[26] She told the court how she has continuing health problems, including cardiac arrhythmia brought on by the "stress of the marriage and the tensions at home." Wife also spoke with fear of Husband's taunting questions about what she might do when the protective order expired. Although Wife's testimony did not track Husband's mistreatment of her in minute detail, it is clear from that testimony and the very existence of a protective order that Husband's conduct far exceeded mere "sallies of passion, harshness, [and] rudeness," *Short*, 151 Md. at 446, 135

_____

year protective order—which, we note, is the maximum duration for an initial order, *see* Md.Code (1984, 1999 Repl.Vol., 1999 Cum.Supp.), § 4–506(b)(2)(iii) of the Family Law Article—it must have found by clear and convincing evidence that abuse occurred or Husband must have consented to its entry, § 5–506(c)(1)(ii), as he did here. By giving such consent, Husband as much as admitted that marital violence occurred.

26. Wife testified:

And my parents also took care of my children for several years while my husband went to school and I worked full-time. And at that time my relationship with my family got strained. Because of the stresses in the marriage, I could not relate to them properly.

I would drop the children off there in the morning, and then all I had to do was pick them up in the afternoon and come right back because I was not allowed to stay, and I was fearful of staying.

Q: Why were you afraid to stay?

A: Because I was made to account for my time, and there was a point where I was made to account for my time for a whole week in half-an-hour increments. And that became very difficult because when you have two small toddlers and you're working, it becomes very hard to account for time like that.

And basically it becomes a form of cruelty, a form of bullying, a form of intimidation.

Q: Did you tell your family about this?

A: I did not tell them anything for several years, but I think it was quite evident to them that I was under a lot of stress and tension....

A. 176, and in fact threatened Wife's physical and emotional well-being. "[W]here violence has been inflicted and threats have been made," as in the instant case, "a Court of Equity should not hesitate to grant relief, especially where the facts indicate a probability that violence might be repeated." *Timanus v. Timanus*, 177 Md. 686, 687, 10 A.2d 322 (1940) (citing *Patterson v. Patterson*, 125 Md. 695, 96 A. 398 (1915)).

 Husband also claims that Wife's testimony was largely uncorroborated. If true, Husband's assertion would be fatal to the final judgment, for "[a] court may not enter a decree of divorce on the uncorroborated testimony of the party who is seeking the divorce." Md.Code (1984, 1999 Repl.Vol.), § 7–101(b) of the Family Law Article; *see also Dicus v. Dicus*, 131 Md. 87, 88, 101 A. 697 (1917) (corroboration required for charges of cruelty). We require corroboration to prevent collusion. *Heinmuller v. Heinmuller*, 133 Md. 491, 494–95, 105 A. 745 (1919); *Timanus*, 177 Md. at 687, 10 A.2d 322. Corroboration

"need not be testimony given by another or other witnesses to all of the same identical facts to the minutest particulars, but only their giving such facts in evidence as already testified to by petitioner, or such circumstances tending to establish them, as renders petitioner's testimony so much more probable as to be legally acceptable, and which serves to empower the judge to accept the truth of the petitioner's whole story."

*Appel v. Appel*, 162 Md. 5, 8, 158 A. 65 (1932) (quoting *Bowersox v. Bowersox*, 157 Md. 476, 480, 146 A. 266 (1929)); *see also Kelsey v. Kelsey*, 186 Md. 324, 328, 46 A.2d 627 (1946) (corroboration "is sufficient if it lends substantial support to the complainant's testimony as to material and controlling facts"). The corroboration required varies with the circumstances of each case; as the likelihood of collusion decreases, so does the degree of corroboration needed. For this reason, if the case precludes the possibility of collusion, only slight corroboration is required. *Heinmuller*, 133 Md. at 495, 105 A. 745; *Timanus*, 177 Md. at 687, 10 A.2d 322.

 Here, despite the quality of proof needed to prove cruelty and excessively vicious behavior, Wife needed only slight corroboration for her testimony, for there was almost no likelihood of collusion. The problems between the parties had long been known to the courts. Domestic violence proceedings had taken place the prior year, culminating in the entry of a one-year protective order. CINA proceedings against Husband were ongoing, because he had allowed Radha to skip school. Husband had fled the jurisdiction of the court, taking Radha with him.

 Wife's brother, Arjun Duggal, corroborated her testimony and, in our view, his testimony was sufficient to establish Wife's entitlement to an absolute divorce. Duggal told the court that Wife had sought refuge in his home in January 1998 after Husband assaulted her. He further testified that he had "observed a pattern of stress, tension in her life since 1986," when he first immigrated to the United States. He also addressed Husband's efforts to isolate Wife from her family,[27] corroborating his sister's testimony in that regard. Duggal's testimony tracked with all major tenets of Wife's testimony, empowering the trial judge to find that Wife told the truth. It thus met the legal standard for corroboration, and we affirm the trial court's judgment of absolute divorce.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**

---

**27.** Duggal testified:

On the occasions that we did have to meet my sister, she was always very tense when she came to pick up the kids. I was in the house also, and she was always in a hurry to get back just based on the fact that he would question her on every second that she spent. He tried to keep her away from her family.

He also had—I've overheard telephone conversations that he had with her in which they argued and—

Q: Did he make threats in those conversations?

A: He made threats of divorce and then turned around and called my mom and told her that my sister was asking for the divorce.

Q: And in your culture, what does a threat of a divorce mean from a man?

A: It is a very serious, very serious matter, and it's not to be taken lightly.