*Donna Frazelle-Foster v. Preston H. Foster*
No. 2716, Sept. Term, 2018
Opinion by Leahy, J.

**Divorce > Grounds > Cruelty of Treatment**

The Maryland General Assembly and the courts understand domestic abuse to encompass verbal and psychological abuse in addition to physical violence. In Maryland, therefore, "cruelty of treatment" as a cause for divorce under Maryland Code (1984, 2020 Repl. Vol.), Family Law Article ("FL"), sections 7-102(a)(1) and 7-103(a)(6) may include verbal and psychological abuse.

**Divorce > Grounds > Cruelty of Treatment**

We hold that "cruelty of treatment" as a ground for limited or absolute divorce does not require physical violence or the threat of physical violence, and may be based upon verbal and psychological abuse which "is calculated to seriously impair the health or permanently destroy the happiness of the other." *Das v. Das*, 133 Md. App. 1, 33 (2000) (quoting *Scheinin v. Scheinin,* 200 Md. 282, 289 (1952)).

**Divorce > Grounds > Cruelty of Treatment > Evidence**

We do not discern a requirement in FL § 7-103(a)(6) that the complaining party must establish, as grounds for an absolute divorce, "more than some inciden[t]s [of cruelty] that are spread out throughout the marriage," or that the incidents of cruelty must be recent.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2716

September Term, 2018

———————————————————————

DONNA FRAZELLE-FOSTER

v.

PRESTON H. FOSTER, SR.

———————————————————————

Fader, C.J.,
Leahy,
Harrell, Glenn T., Jr.
    (Senior Judge, Specially Assigned),

JJ.

———————————————————————

Opinion by Leahy, J.

———————————————————————

Filed: March 31, 2021

 Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

This appeal emanates from a divorce proceeding initiated in the Circuit Court for Prince George's County by Donna Frazelle-Foster against Preston H. Foster, Sr. Following a hearing, the circuit court denied Donna's[1] complaint for absolute divorce, or, in the alternative, for limited divorce on grounds of cruelty of treatment and constructive desertion. Donna filed a timely appeal. The circuit court, she claims, erred by denying her complaint for absolute divorce on the ground of cruelty of treatment.[2]

We vacate the judgment of the circuit court. We conclude that the court failed to consider the more recent and more inclusive standards required to prove cruelty of treatment as a ground for divorce under Maryland Code (1984, 2020 Repl. Vol.), Family Law Article ("FL"), sections 7-102(a)(1) and 7-103(a)(6). We hold that "cruelty of treatment" as a ground for limited or absolute divorce does not require physical violence or the threat of physical violence, and may be based upon verbal and psychological abuse which "is calculated to seriously impair the health or permanently destroy the happiness of the other." *Das v. Das*, 133 Md. App. 1, 33 (2000) (quoting *Scheinin v. Scheinin,* 200 Md. 282, 289 (1952)).

---

[1] In order to avoid confusion and meaning no disrespect, we refer to the parties by their first names.

[2] Donna presents a single issue, stated as follows in her brief:

"Did the trial court err as a matter of law in finding that Plaintiff failed to establish the ground of cruelty of treatment and thereby denying her request for absolute divorce?"

## BACKGROUND

Donna and Preston first married in North Carolina in 1982 and moved to Maryland that same year. They divorced in Maryland in 1988. Three years later, Donna and Preston remarried and have lived in Maryland throughout their second marriage. They have one son who was born in 1996.

At the time of their remarriage in 1991, Preston was employed by the United States Department of State, and Donna was employed as an assistant supervisor in the Prince George's County Department of Social Services. Eventually, Preston accepted a position with the United States Agency for International Development where he remained until his retirement in 2016. Throughout the parties' second marriage, Preston has been the primary "breadwinner." According to Donna, she left her job in 2002 to care for their son because Preston traveled frequently for work. She has since remained unemployed.

Donna and Preston have resided in the same marital home in Mitchellville, Maryland, since 1998. In 2012, the couple ceased having sexual relations and now live in separate parts of the home.

On February 8, 2017, Donna filed a complaint for absolute divorce or, in the alternative, a limited divorce on the grounds of cruelty of treatment and constructive desertion.[3] Count I of the complaint alleges, in pertinent part, that

> [Preston] has persistently engaged in cruelty of treatment of [Donna], and
> has engaged in excessively vicious conduct, endangering [Donna]'s safety,

---

[3] Donna has not appealed the circuit court's denial of the divorce under Count II of the complaint alleging constructive desertion. Donna did not seek a "no fault" absolute divorce under FL §7-103(a)(4) (based on 12-month separation) or (a)(8) (mutual consent); or, a "no fault" limited divorce under FL §7-102 (a)(4) (separation).

health, and happiness, and has verbally abused, harassed and humiliated her on numerous occasions, rendering the continuation of the marital relationship impossible if [Donna] is to preserve her health, safety, and self-respect.

On May 1, 2017, Preston filed an answer, requesting that the complaint be denied.

The court conducted an evidentiary hearing on Donna's claim for absolute divorce or, in the alternative, limited divorce on January 25, 2018. Both parties were represented by counsel and were the only witnesses.

**Donna's Testimony**

Donna testified that the parties began experiencing marital problems in 1998, a few years after the birth of their son, because Preston "began to make major household decisions without [her] input." Donna explained that the parties' problems have "escalated over the years." Specifically, Donna testified:

> The difficulties I was having in my marriage was [sic] that [Preston], he treats me cruelly. He calls me out of my name [sic] constantly. He belittles me in front of our son and others. He withholds financial support and makes me beg for food. He leaves the residence for weeks and goes to North Carolina, so he says. He does not tell me when he's coming and going. I've had to accept this, because I raised our son.
> * * * * *
> So he was gone for periods of three months . . . for work, and then he would return home. But he wouldn't tell me he's coming home. He would just show up at the door or scare me or frighten me. Then he would leave for North Carolina. He had purchased two homes in North Carolina in 2005. He would leave the residence without telling me. He didn't inform me of that purchase or anything. And when I asked him things, he would tell me it's none of my business. He would tell me he makes the majority of the money. I don't make as much money as him, therefore, he gets to make the decisions, because he who owns the gold makes the rules.

Donna then introduced into evidence a letter, admitted into evidence as Plaintiff's Ex. 1, that she received from Preston. The letter stated:

3

I am sick and tired of your holier than [thou] bullshit attitude. You are offended by my use of the word BITCH, however, you let Levin call you a bitch in front of your coworkers and you did nothing. Then you let a fat bitch run you out of you[r] job of 15 years. You have no problem sucking another woman's husband dick that simply placated you, but when your own husband does the best he can, and provides for you[,] [y]ou can't even sleep in the same bed with him. He has to jerk off and deal with it. The nerve of you to question my love for you, if it were not for me you would be living in some shithole. Don't you ever question my love for you as long as I pay the rent, the insurance, the groceries and every motherf[***]ing thing else[.] BITCH.

I HAVE ALWAYS LOVED YOU!!!!

Donna testified that she felt "humiliated" and "hurt" by the letter. It "tore [her] up to know that [those were] his sentiments." According to Donna, Preston further humiliated her a few years later, in 2006, by reading the note aloud to neighbors during a dinner at Donna and Preston's house.

Donna related that Preston wrote other similar notes that hurt her feelings and made her feel "worthless." When she "asked [Preston] about [the notes], he would tell [her] that [her] feelings don't matter. He felt justified." Preston frequently calls her "offensive names in front of their son," in an attempt, Donna guessed, to "silence [her]." In fact, Donna testified, Preston demeans her on a regular basis for "the person [she] happen[s] to be, the way [she] walk[s], the way she stand[s]." Furthermore, she said, Preston never leaves her alone with her friends and monitors her calls.

Finances are a constant source of strife between Donna and Preston. Donna reiterated that Preston is the primary "breadwinner," and that her income consists of

4

$645.69 from the State of Maryland.[4]  She explained that because Preston is responsible for the family's food, personal care needs, and their son's tuition, he "controls [their] whereabouts, because you can't do much in the world without money."  Donna testified that Preston "controls everything"[5] and "let it be known to both [Donna and their son] that [they] have to do what he says."  Donna recounted that, in January of 2017, Preston mostly stopped supporting her financially, requiring her to "beg" for small amounts of money for basic necessities.  He also canceled her Costco membership card without telling her.

Donna imparted that Preston's financial control affects her relationship with her son. She explained that, when Preston is not at home, her relationship with her son is "pleasant," but that the relationship is strained when Preston is present.  This strain, Donna opined, is the result of "pressure" imposed on their son due to Preston's financial control over the family—he "pay[s] all the bills and will withhold" and "retaliate" if their son does not behave in the way that he wants.

Donna asserted that Preston "is determined to mentally break me down."  She testified that

> he has said that I was crazy.  He has called my brother out of state and asked him to persuade me to get psychological help.  He tells me I have mental condition.  On the next hand, he would tell me he's not responsible for me. Then on the next hand, he would send me dozens of roses and then won't even speak to me when he comes in the home.  But he does that show for our son to give the appearance of care, but he does not care for me.
> He does not communicate with me.  He instigates and humiliates me

---

[4] We assume that Donna was referring to monthly income, but the record does not specify the source of income.

[5] Donna later testified that she and Preston have separate bank accounts and that she does not have access to Preston's account.

constantly.

Over the years, Preston required Donna to sign "apology" notes to receive money for basic necessities, including car repairs. She recalled that Preston "had several things that sometimes [she] would just sign just to get what it was that [she] or [her son] needed." Donna testified that these incidents made her feel "like less than a person." As an example, Donna introduced into evidence a typed letter, admitted as Plaintiff's Ex. 2, stating,

> I Donna E Frazelle-Foster apologize to my husband Preston H Foster Sr. and my son [] for my behavior during the Christmas Holidays. I[n] exchange for this apology my husband will repair my 1986 Mercedes Benz 420 SLC. I sign this on my own free will because I am truly sorry and regret my behavior.

The letter was signed by Donna, Preston, and their son.

Donna described one incident of violence in February 2006 when Preston "pushed [her] down to the floor, and [she] called police." No charges were filed. According to Donna, "the call was enough that [Preston] did not put his hands on me physically again, although he mentally hurts me every opportunity he gets." She later noted, however, that she remains fearful that Preston will harm her "physically" and that he has yelled and shouted at her in a way that has made her both "intimidated and fearful." She testified that she feels like she is living "in a prison," and that she "feel[s] at times that [she is] becoming mentally unstable."

Donna recalled another incident in 2010, during the car ride back to Maryland from North Carolina, when she asked Preston to stop for a bathroom break. Rather than stop, he became angry and "just accelerate[d] and start[ed] driving reckless." Donna stated that Preston did not stop the car until their son requested a break.

6

Donna revealed that she "initially sought a divorce in 2012," and that the parties have maintained separate bedrooms and ceased having sexual relations since then.

In early 2013, Preston sent Donna an email, admitted at trial as Plaintiff's Ex. 4, regarding a "suggested settlement" that he had offered in anticipation of the parties' divorce. The email began, "Donna. I have come to grips with the fact that we will soon be devoiced. [sic] I am concerned that after all is said and done that I will not be able to fulfill my promise to our son and pay for his college education." After setting out the terms of his settlement offer, Preston concluded in his email to Donna:

> I am sorry I did not meet your expectations as a husband after marr[y]ing you twice. I never cheated on you but I must admit at this point [I] wish I did. I still love you and I always will. If you must have this [divorce], allow me to take care of our son.

Preston then forwarded the email to his son on March 11, 2013, and his forwarding message read: "Please see below what I am offering your mom. Hopefully this will make her happy."

Donna testified that she ceased speaking to Preston following an incident in 2016 that led her to believe that Preston had "manipulated" their son to pursue assault charges against her.[6] Donna told the court that she has avoided Preston at home, has not responded

---

[6] Donna described the alleged incident on direct examination:

> My husband had just returned from Pakistan where he was and had been in residence. My son and I – trash day is trash day. Usually I help him gather the trash, and it was time to do the trash. And I asked him about two or three times, you know, [son], it's time for trash. Did you hear me? And I waited an hour. Then I finally went and got him and said, "Look, you need to come and do the trash." So we went down into the garbage. And my son

(Continued)

7

to his greetings, and does not "move in the same space that he does." She added that they cook separately and do not spend time in the same rooms.

**Preston's Testimony**

Preston testified to his version of the events described by Donna. He asserted that he did not separate from Donna and denied influencing their son to file assault charges against her. To the contrary, he claimed that he had a "long in-depth conversation with [their son] about the ramifications of going to court and taking his mother to court" and the long-term effects that this might have on him.

Regarding the letter admitted as Plaintiff's Ex. 1, Preston stated that he wrote the letter after Donna told their son, who was then a young child, that the parties were divorcing. Preston stated that Donna's statement "upset [their son] real bad," causing Preston to "just los[e] it." With respect to his sharing the letter with neighbors, Preston claimed that Donna raised the issue of the letter in the course of her comments to the neighbors regarding "how inefficient [Preston] was as a spouse and how she was displeased with [him]." Preston explained that he had apologized to Donna for the letter, but that Donna "really didn't accept the apology and she held onto it."

---

was being very rude and disrespectful. I asked him why didn't he come? He said, why are you asking me?

I was offended. I dropped the trash bag, went in, and he huffed and puffed. He told his father that I had pushed him down.

Donna further explained that Preston drove their son to the courthouse "to file second degree charges on [her]." She related that, "[o]nce that was done, the trial was in November. In November, I was found not guilty. I expunged the charges. Our son was still very upset . . . At any rate, my relationship with our son was being severed."

8

Preston admitted that he gave Donna various documents to sign during the marriage as "[his] way of documenting what actually occurred," and his way of getting "things done to make sure that she wouldn't be able to say I didn't tell her or she wouldn't know." Regarding Plaintiff's Ex. 2—the letter in which Donna apologized for her behavior during Christmas in exchange for repairs to her car—Preston alleged that Donna's "yelling, screaming, [and] threatening a divorce, . . .messed up [their son's] Christmas" so he made her sign the letter because he "wanted her to apologize to [their son]."

Preston confirmed that the police were called to the house once during one altercation. He claimed that Donna was angry and "grabbed [their son] and was pushing him around in anger." He explained that, when he intervened, Donna claimed that he had pushed her. Preston denied that he ever physically assaulted Donna. According to Preston, Donna periodically called him names, such as "black mother[**]cker."

In 2012, Donna moved Preston's personal items to another bedroom. Preston testified that Donna told him that she did not want him in the bedroom, so, although he did "not willingly" go to another bedroom, he did so to avoid fighting with Donna. Preston confirmed that the parties have maintained separate bedrooms since 2012.

On cross-examination, Preston confirmed that he was the "breadwinner" throughout the parties' second marriage. He acknowledged that, in the past, he would draw up documents, such as "memorand[a] of conversation," and have Donna sign them. He admitted that he would also have his son sign some of these documents as a witness and that he would inform his son of conversations with Donna concerning the status of their marriage.

9

Preston denied withholding financial support from Donna and claimed that he still provides financially for the family. He testified that he had recently given Donna money to cover her prescriptions. He only removed Donna from their Costco account because she refused to discuss or "coordinate" her purchases with him in advance. He denied conditioning his financial support on Donna's willingness to admit or accept blame for certain things. However, he later conceded that he had conditioned his financial support in the past, including one circumstance in which he told Donna that he would buy her an "expensive pair of shoes" only if they "had sex." Preston also admitted that he forged Donna's signature and falsified a notary stamp on forms he filled out to access his retirement benefits.

Preston acknowledged that the parties have not had a "model marriage" but explained that he "ha[d] done everything [he] could to meet [his] obligation and promise that [he] made in the marriage," and stated that he would like to remain married.

## Circuit Court's Ruling

The judge delivered her ruling from the bench following closing arguments. Although the judge found that "there is a financial disparity," she noted that Donna pled for a divorce on the grounds of cruelty and constructive desertion. The court noted that the letter admitted as Plaintiff's Ex. 1 was "horrific, terrible," and "vile."[7] The judge indicated that she found the letter to be "cruel," but noted that Donna had produced only one such

---

[7] Upon Donna's motion for Judgment, the judge stated that "some people would say this letter is enough" and that it was "cruel." She also noted that the parties' "whole living arrangement is cruel, in some respects."

10

letter. Concerning Plaintiff's Ex. 2, in which Donna signed a letter of apology, the court noted that "something must have happened during the holidays that led to [the parties] coming to a discussion about the repair, and the son again signed this." With respect to Plaintiff's Ex. 4, the "suggested settlement" email, the court found that the email "doesn't fall under cruelty," though the court questioned Preston's judgment in sharing the email with their son.

The court explained that, in terms of establishing fault, "you need more than some inciden[t]s that are spread out throughout the marriage." The court's determination appears to have turned on Donna's failure to establish "a continuing behavior or pattern":

> I kept asking you, [Donna's counsel], to give me something after 2012 for a continuing behavior or pattern. I have 2006 to 2008 but not much after that either. It's just not sufficient, I believe, under Maryland law because the language is so strong about even in your pleading; cruelty of treatment, excessive vicious conduct endangering her safety, health and happiness.

> I think the statute is clear, if a Court is going to find that in terms of at fault, you need more than some inciden[t]s that are spread out throughout the marriage, and they've been married for quite a long time, 20-plus years.

> In terms of his harassment, there's some problems with his harassment. He was willing to do this in order to get his maximum benefit. That's an issue for another day.

The court also determined that Donna had failed to meet her burden of establishing constructive desertion. The judge announced that she did not "see [Preston] necessarily deserting [Donna], per se" if the parties decided that Donna would no longer "stay in the same room . . . because she's not happy with him."[8] The circuit court entered a written

---

[8] The judge's entire ruling on Count II was:

(Continued)

11

order on August 2, 2018, denying Donna's complaint for absolute divorce, or in the alternative, limited divorce.

Donna filed a timely motion to alter or amend judgment on August 13, 2018, which was denied in an order entered on September 13, 2018**.** Donna noted her appeal on October

---

> So I think constructive desertion, she's to no longer stay in the same room. I don't see him necessarily deserting her per se, if they're going to make that decision because she's not happy with him. But I think this statute is very clear, that you haven't met the burden, so it's denied.

We recognize that Donna does not challenge the trial court's ruling on constructive desertion in this appeal. We observe, however, that even as far back as 1952, when the Count of Appeals decided *Scheinin v. Scheinin*, a spouse could obtain a limited divorce if they moved into a separate bedroom on account of the other spouse's behavior. 200 Md. 282, 291-93 (1952). The Court in *Scheinin* explained:

> Any misconduct of the husband will justify the wife in leaving him when it makes it impossible for her to live with him without loss of her health or self-respect, or gives her reasonable apprehension of bodily injury. ***If the husband's misconduct has been such as to render continuance of the marriage relation unbearable, justifying the wife in leaving him, he is the one who is guilty of desertion.*** It is beyond question that there may be a desertion ***although the husband and wife continue to live under the same roof***. For desertion, as applied to husband and wife, signifies something more than merely ceasing to live together. It means ceasing to live together as husband and wife.

*Id.* at 290-91 (emphasis added) (citations omitted). It was not required that the husband "drive his wife from home by force. If ill temper, vile language and artifice succeed, they are as reprehensible as forcible compulsion. In either case the offending party is responsible for the separation." *Id.* at 292; *see also Ricketts v. Ricketts*, 393 Md. 479, 489-493 (2006) (holding that husband stated claim for limited divorce on ground of constructive desertion because wife "denied him marital relations and forced him from the marital bedroom" despite "still living under the same roof"); *Carpenter v. Carpenter,* 257 Md. 218, 225 (1970) (holding that circuit court did not err in granting divorce on ground of constructive desertion, even though wife left husband, because evidence supported that husband's sexual assault, physical and verbal abuse of wife caused her to leave).

12

5, 2018.[9]

## DISCUSSION

On appeal of a non-jury action, we apply the standard of review expressed in Maryland Rule 8-131(c):

> When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witness.

We "accord great deference to the findings and judgments of trial judges, sitting in their equitable capacity, when conducting divorce proceedings," and "absent evidence of an abuse of discretion, the trial court's judgment ordinarily will not be disturbed on appeal." *Boemio v. Boemio*, 414 Md. 118, 124-25 (2010) (citation and quotation marks omitted). A trial court's legal conclusions, however, we review de novo. *Jackson v. Sollie*, 449 Md. 165, 174 (2016).

### A. Donna's Contentions[10]

Donna asks this Court to consider whether the trial court erred as a matter of law in denying her request for an absolute divorce, or in the alternative, a limited divorce. She claims that "[i]t is now accepted that **cruelty** as a cause for divorce includes any conduct on the part of the husband or wife which is calculated to seriously impair the health or

---

[9] Donna's appeal was submitted on brief in August 2020, following a delay in transmission of the necessary transcripts, necessitating a Show Cause Order and response; followed by several motions filed by Donna to correct the record and for extension of time.

[10] Preston did not file a brief or otherwise participate in this appeal.

permanently destroy the happiness of the other."  Citing *Das v. Das,* 133 Md. App. 1 (2000), she avers that "[t]he original definition of cruelty has been expanded to include mental abuse as well as physical."  Donna admits that the use of profane and indecent language by Preston is not sufficient to constitute cruelty, but argues that Preston's habit of using such language, together with the other misconduct elicited at the hearing in this case, establishes a pattern of conduct that was intended to seriously impair her health and destroy her happiness.  She concludes that the incidents were sufficient to establish cruelty, regardless of when they occurred, and should have been sufficient for the trial court to award her an absolute divorce from Preston.  "[T]here is nothing in the law[,]" she insists, "that requires that the incidents cited . . . be recent."

## B.  Applicable Law

Cruelty of treatment was not included among the grounds for absolute divorce under the Family Law statute until 1998.  1998 Md. Laws, ch. 349 (S.B. 194).[11]  That year, the Maryland General Assembly, responding to public alarm over the prevalence of domestic violence, "eliminate[d] the 12-month waiting period before the victimized spouse may file a complaint for absolute divorce."  Senate Judicial Proceedings Committee, Bill Analysis, Senate Bill 194 (1998).  Today, FL § 7-103(a)(6) authorizes a court to decree an absolute divorce on various grounds, including "cruelty of treatment toward the complaining party or a minor child of the complaining party, if there is no reasonable expectation of

---

[11] Excessively vicious conduct was also added to the statute as a ground for absolute divorce in 1998.  1998 Md. Laws, ch. 349 (S.B. 194).

reconciliation[.]"[12]   Alternatively, a court may grant a *limited* divorce under FL § 7-102(a)(1) on the grounds of cruelty of treatment of the complaining party or of a minor child of the complaining party.[13]

Prior to 1998, cruelty of treatment was a ground for limited divorce only.  *Das v. Das,* 133 Md. App. 1, 32 (2000).  Nearly all of Maryland's decisional law defining "cruelty of treatment" predates its codification as a ground for absolute divorce in 1998.  We explained in *Das* that, because divorce was disfavored, limited divorce on the ground of cruelty sought "only to protect the victim-party from further and more serious physical harm."  *Id.*  In other words, cruelty was originally a ground only for "judicial separation of husband and wife, but not a ground for dissolution of the contract of marriage."  Cynthia Callahan & Tom C. Ries, Fader's Maryland Family Law, § 4-4(h)(2) (6th ed. 2016).

**Original Contours of "Cruelty of Treatment" for a Limited Divorce**

The Court of Appeals tracked the early development of cruelty of treatment as a

---

[12] The current versions of FL §§ 7-102 and 7-103 took effect, respectively, on October 1, 2015 and October 1, 2018.  2015 Md. Laws, ch. 226 (H.B. 165); 2018 Md. Laws, ch. 782 (H.B. 1368); 2018 Md. Laws, ch. 849 (S.B. 96); 2018 Md. Laws, ch. 850 (S.B. 120).  Amendments to FL § 7-103 in 2018 modified certain aspects of the grounds of mutual consent and 12-month separation, none of which are relevant to this appeal.  As we further explain below, the provision providing "cruelty of treatment" as a ground for an absolute divorce was last amended in 2003.  2003 Md. Laws, ch. 419 (H.B. 346).

[13] While cruelty once "was the most frequently used cause of action in divorce suits," it has been utilized with less frequency with the advent of no-fault divorce in many jurisdictions. Trisha Zeller, *Grounds for Divorce*, Family Law and Practice, § 4.01[1], [2]; 4.03 [5] (Arnold H. Rutkin, ed., 2020).  Trial courts prefer to decide divorce cases on no fault grounds because a no-fault divorce requires less trial time and results in less acrimony between the parties.  *Id.* at § 4.01[1]; *see also* Robin Fretwell Wilson, *Beyond the Bounds of Decency: Why Fault Continues to Matter to (Some) Wronged Spouses*, 66 Wash & Lee L. Rev. 503, 504 (2009).

ground for limited divorce in *Scheinin v. Scheinin*:

> In England matrimonial disputes were subject to the jurisdiction of the Ecclesiastical Courts, which were governed by the principles of the civil and canon law. According to the canon law, extreme cruelty was a ground for a judicial separation of husband and wife, but not a ground for dissolution of the contract of marriage. Under the rule adopted by the Ecclesiastical Courts, there must have been *actual or threatened physical violence* on the part of the defendant threatening bodily injury of the complainant to constitute cruelty.

200 Md. 282, 287 (1952) (emphasis added). English Ecclesiastical Courts, our Court of

Appeals noted, held that

> [m]ere austerity of temper, petulance of manners, rudeness of language, a want of civil attention and accommodation, even occasional sallies of passion, if they do not threaten bodily harm, do not amount to legal cruelty: they are high moral offenses in the marriage state undoubtedly, not innocent surely in any state of life, but still they are not that cruelty against which the law can relieve. Under such misconduct of either of the parties, for it may exist on one side as well as on the other, the suffering party must bear in some degree the consequences of an injudicious connection; must subdue by decent resistance or by prudent conciliation; and if this cannot be done, both must suffer in silence. And if it be complained that by this inactivity of the courts much injustice may be suffered, and much misery produced, the answer is that courts of justice do not pretend to furnish cures for all the miseries of human life.

*Id*. at 287-288 (quoting *Evans v. Evans*, 4 Eng. Ec. 310 (1790)).

In 1842, the Maryland General Assembly "conferred jurisdiction in all applications for divorce upon the Chancellor or any County Court of the State sitting as a court of equity." *Id.* at 288. The statute provided that a divorce "*a mensa et thoro*" (from bed and board) may be decreed "for the following causes: cruelty of treatment, excessively vicious conduct, and abandonment and desertion." *Id.* (citing 1841 Md. Laws, ch 262.).

16

The Court of Appeals instructed in *Childs v. Childs* that, "[t]he Legislature, whilst committing jurisdiction in matters of divorce to the Circuit Courts of the State, did not . . . diminish in any degree the sacred obligations of marriage." 49 Md. 509, 514 (1878). The Court explained that in regard to matrimonial causes, principles of canon and civil law, derived from the English Ecclesiastical Courts, "became a part of the common law, and as such [were] recognized and adopted by the declaration of rights and Constitution of this State as a part of the law of the land." *Id.* Accordingly, the terms "abandonment and desertion, or cruelty of treatment" contained in the "Code of Public General Laws . . . must be understood as interpreted by the courts of special jurisdiction from which they were derived." *Id.* The Court further observed that "[t]here are undoubtedly cases for which a separation is provided, but it must be lawfully decreed by public authority and for reasons which the public approves." *Id.* at 515 (citations omitted).

In this Court's most recent opinion on the subject, *Das v. Das*, we surveyed much of Maryland's "old" cruelty law and noted that our precedent, unfortunately, shows "remarkable tolerance for abusive behavior." 133 Md. App. at 34. For example, in *Bonwit v. Bonwit*, the Court of Appeals held that the husband's "violent outbursts of temper, accompanied in some instances by his slapping" his wife did not constitute cruelty. 169 Md. 189, 193 (1935). In *Hasting v. Hastings*, the Court concluded that constant abusive language and drunkenness did not constitute cruelty, especially when wife knew that husband was a problem drinker when they married. 147 Md. 177, 181-183 (1925).

Circumstances in which courts found cruelty sufficient to award a limited divorce included serious, continuous, corroborated physical abuse that indicated a likelihood of

17

future abuse and public accusations of infidelity. For instance, the Court of Appeals reversed a judgment denying wife's request for a limited divorce, holding that the "evidence is clear and convincing as to the charge of cruelty of treatment and excessively vicious conduct on the part of the husband on various occasions[.]" *Sharp v. Sharp*, 105 Md. 581, 582-83 (1907). The Court observed that:

> The wife testified that at various times her husband struck her, was excessively cruel to her, and that his cruel treatment consisted of repeated blows, threats to kill and shoot her, and other vicious conduct.
> On one occasion, he struck her in the back with his fist. At another time, he pointed a loaded pistol and threatened to shoot her. He threw her, when in a delicate condition, over a chair, and she fell to the floor.
> She further testified that he repeatedly threatened to kill her, and his threats became so frequent she believed he would do so, and also kill her child[.]

*Id.* at 583.

Almost half a century after *Sharp*, the Court of Appeals expanded the contours of what constitutes "cruelty" in *Scheinin v. Scheinin* by relying on "modern decisions" in both England and the United States. 200 Md. at 289. Still, the Court affirmed the chancellor's decree of limited divorce on the ground of desertion rather than on cruelty of treatment. *Id.* at 289, 293. In *Scheinin*, the wife filed for a limited divorce after the husband invited his secretary, with whom he appeared to be conducting an affair, to live with them, and then kicked the wife out of the bedroom. *Id*. at 285-287. The wife testified that the husband used abusive language toward her, ridiculed her before their children, and hit her on multiple occasions. *Id*. at 285-287.

Although not the basis of the Court's holding in *Scheinin*, as mentioned above, the Court traced the law on cruelty of treatment back to its roots in the Ecclesiastical Courts of

18

England.  *Id.* at 287.  Then, writing for the majority, Judge Delaplaine proceeded to explain

several departures from the older precedent.  First, the majority declared:

> [I]t is now accepted in Maryland, as well as generally throughout the country,
> that a single act may be sufficient to constitute the basis for a divorce on the
> ground of cruelty, if it indicates an intention to do serious bodily harm or is
> of such a character as to threaten serious danger in the future.

*Id.* at 289.  Second, the majority announced that "in Maryland physical violence is no

longer essential to constitute cruelty of treatment.  It is now accepted that cruelty as a cause

for divorce includes any conduct on the part of husband or wife which is calculated to

seriously impair the health or permanently destroy the happiness of the other."[14]  *Id.* at 289.

Judge Delaplaine expounded:

> The courts have seen the changing social sense of propriety, and now
> recognize that physical violence is not the most dreadful injury that can be
> inflicted upon persons of refined sensibility.  In ancient days it was not
> understood that mental suffering had anything to do with bodily ills.

*Id.* at 290.

The progressive trend articulated in *Scheinin* suffered a few setbacks.  In *Harrison*

*v. Harrison,* for example, the Court of Appeals held that the wife's evidence did not

establish cruelty of treatment, because she cited "only" three incidents of violence

---

[14] The boldness of this declaration, at the time, is reflected in Judge Markell's
dissenting opinion:

> [T]he discussion of cruelty in the opinion seems entirely foreign to the instant
> case.  Be that as it may, neither the cases cited nor any other case in this court
> supports the asserted trend of decisions broadening 'cruelty' from physical
> cruelty to the fantastic forms of 'mental cruelty' that are recognized in the
> large divorce mills.

*Id*. at 295.

perpetrated against her that did "not measure up to what the law of [Maryland] requires for a showing of cruelty of treatment sufficient for the granting of a divorce, or as constituting a justification for the wife's living away from her husband." 223 Md. 422, 426 (1960). There were two occasions on which the husband "slapped or pushed his wife" that the Court felt were "of such trivial significance that they need not be detailed," and a serious incident in which husband tried to force wife to have sexual intercourse, wife bit husband's tongue in an attempt to stop him, and husband severely beat her in retaliation. *Id*. at 424. *See also Neff v. Neff*, 13 Md. App. 128, 132 (1971) (holding that one incident of violence and constant verbal abuse are insufficient for divorce on the ground of cruelty because the wife did not appear to be "in such fear for her health and safety"); *Galvanga v. Galvanga*, 10 Md. App. 697, 702 (1971) (holding that where a husband was verbally abusive to wife over the course of a 26-year marriage and hit wife one time, evidence was not sufficient to allow a limited divorce based on cruelty).

Nevertheless, following *Scheinin,* more and more cases recognized that physical violence was no longer essential to constitute cruelty of treatment. *See e.g. Golas v. Golas*, 247 Md. 621, 624-25 (1967) (holding that cruelty means "any conduct on the part of the husband that endangers, or creates a reasonable apprehension that it will end in endangering, his wife's health to a degree rendering it physically or mentally impossible for her properly to discharge the marital duties"); *Ballan v. Ballan*, 251 Md. 737, 742 (1969) (holding that cruelty exists where there is "a pattern of persistent conduct which is detrimental to the safety or health of the complaining spouse, or so demeaning to his or her self-respect as to be intolerable." (quoting *Murphy v. Murphy*, 248 Md. 455, 460 (1968)).

20

Over time, the epidemic of domestic violence was brought to the forefront of social consciousness.[15]  The 1990s saw a flurry of activity seeking to address the problem.[16]  In 1994, Congress enacted the Violence Against Women Act as Title IV of the Violence Crime Control and Law Enforcement Act, which comprehensively addressed the global problem of gender-based violence under federal law for the first time.  Pub. L. No. 103-322, §§ 40001-03, 108 Stat. 1796, 1902-55 (1994) (codified as amended in 34 U.S.C.).

**Absolute Divorce Statute is Amended**

Although the General Assembly enacted Maryland's first domestic violence statute in 1980,[17] by the mid-1990s, it was clear that further action was needed.[18]  In 1995, in response to a significant increase in reports of family violence, Lieutenant Governor Kathleen Kennedy Townsend and Attorney General J. Joseph Curran, Jr. created the Family Violence Council to "prevent and reduce family violence in Maryland, and to break

---

[15] *See* Cynthia Callahan & Tom C. Ries, Fader's Maryland Family Law, § 10-1 (6th ed. 2016) ("Efforts to reform the law and social norms regarding domestic violence began in earnest in the U.S. in the mid-1970s.").

[16] *See* Evan Stark, *Looking Beyond Domestic Violence: Policing Coercive Control*, 12 J. of Police Crisis Negot. 199, 200 (2012) ("By the late 1990s, federal and state law defined violence by partners as a criminal offense[.]").

[17] Originally codified at Maryland Code (1974, 1980 Repl. Vol, 1980 Supp.), Courts and Judicial Proceedings Article ("CJP") §§ 4-501-4-506, the statute was repealed by Chapter 296 § 1 of the Acts of 1984, and was reenacted at Maryland Code (1984) Family Law Article, §§ 4-501-4-516.

[18] The Court of Appeals reported that, in 1994 alone, "fourteen-thousand victims sought relief from abuse through filing petitions for temporary protective orders in the courts of this state in 1994 alone." *Coburn v. Coburn*, 342 Md. 244, 252 (1996) (citing Christina Asquith, *Domestic Abuse Cases Multiply*, The Baltimore Sun, Nov. 5, 1995).

the cycle of violence between generations." The Md. Att'y Gen. & Lt. Governor's Fam. Violence Council, *Stop the Violence: A Call to Action*, 1 (1996). In 1996, the Family Violence Council published a report containing twenty recommendations and an action plan for addressing the "epidemic of family violence that has been spreading in households across the United States." *Id*.

One of the key recommendations sought by the Council was an amendment to Maryland's divorce law. *Id*. at 32. The Council pointed out that "[m]any married victims of abuse want to get divorced," but that, at the time, Maryland law required a one-year period of separation before an absolute divorce could be obtained. *Id*. The Council observed that, "[i]n cases where a court finds a history of abuse between the parties, the victim of abuse should not have to spend another year legally bound in marriage to her abuser." *Id*. Accordingly, the Council proposed legislation to abrogate the one-year waiting period and suggested a "bill to remove the one year waiting period for divorce, when a court finds a history of abuse." *Id*. at 33.

The General Assembly responded to the Council's recommendations, and after several attempts, in 1998 cruelty and excessively vicious conduct were added as grounds to the statute governing absolute divorce. 1998 Md. Laws, ch. 349 (S.B. 194); Senate Judicial Proceedings Committee, Bill Analysis, Senate Bill 194 (1998). The Bill Analysis described the statutory amendment as taking "two of the existing grounds for limited divorce and [making] them grounds for absolute divorce." Senate Judicial Proceedings Committee, Bill Analysis, Senate Bill 194 (1998). The intention was to adopt the recommendation of the Family Violence Council and "eliminate the 12-month waiting

22

period before [a] spouse [victimized by domestic abuse] may file a complaint for absolute divorce." *Id*.

The language added to Section 7-103(a) of the Family Law Article in 1998 rendering cruelty and excessively vicious conduct grounds for an absolute divorce was amended again in 2003 to add "or a minor child of the complaining party." 2003 Md. Laws, ch. 419 (H.B. 346). Currently, section 7-103(a) reads, in its entirety:

(a) *Grounds for absolute divorce*. – The court may decree an absolute divorce on the following grounds:
(1) adultery;
(2) desertion, if: (i) the desertion has continued for 12 months without interruption before the filing of the application for divorce; (ii) the desertion is deliberate and final; and (iii) there is no reasonable expectation of reconciliation;
(3) conviction of a felony or misdemeanor in any state or in any court of the United States if before the filing of the application for divorce the defendant has: (i) been sentenced to serve at least 3 years or an indeterminate sentence in a penal institution; and (ii) served 12 months of the sentence;
(4) 12-month separation, when the parties have lived separate and apart without cohabitation for 12 months without interruption before the filing of the application for divorce;
(5) insanity if: (i) the insane spouse has been confined in a mental institution, hospital, or other similar institution for at least 3 years before the filing of the application for divorce; (ii) the court determines from the testimony of at least 2 physicians who are competent in psychiatry that the insanity is incurable and there is no hope of recovery; and (iii) 1 of the parties has been a resident of this State for at least 2 years before the filing of the application for divorce;
(**6) cruelty of treatment toward the complaining party or a minor child of the complaining party, if there is no reasonable expectation of reconciliation;**
**(7) excessively vicious conduct toward the complaining party or a minor child of the complaining party, if there is no reasonable expectation of reconciliation; or**
(8) mutual consent, if: (i) the parties execute and submit to the court a written settlement agreement signed by both parties that resolves all issues relating to: 1. alimony; 2. the distribution of property, including the relief provided in §§ 8-205 and 8-208 of this article; and 3. the care, custody, access, and

23

support of minor or dependent children; (ii) the parties attach to the settlement agreement a completed child support guidelines worksheet if the settlement agreement provides for the payment of child support; (iii) neither party files a pleading to set aside the settlement agreement prior to the divorce hearing required under the Maryland Rules; and (iv) after reviewing the settlement agreement, the court is satisfied that any terms of the agreement relating to minor or dependent children are in the best interests of those children.

FL § 7-103(a) (emphasis added).

## *Das v. Das*

*Das v. Das* was the first appellate decision to address whether an absolute divorce was granted on the ground of cruelty of treatment and/or excessively vicious conduct properly under FL § 7-103(a). 133 Md. App. 1 (2000). We affirmed the circuit court's decision to grant the wife in that case an absolute divorce. *Id.* at 32. The wife had filed for divorce, citing cruelty and excessively vicious conduct over the course of the parties' approximately twenty-year marriage. *Id*. at 6-7, 10. The husband, who "sojourn[ed] in India after spiriting away one of the couple's minor children," did not participate in the divorce hearing and claimed (unsuccessfully) that he was not properly served. *Id.* at 6-11.

In support of her allegations of cruelty, the wife did not recount specific incidents of violence; however, she did describe husband's "ongoing cruelty" to include hitting, pinching, pulling her hair, and isolating her from her family and friends. *Id.* at 37-38. We also noted that the history of violence between the parties "justified entry of a one-year protective order in January 1998, after a particularly violent incident that was 'one in several cases of domestic violence.'" *Id.* at 37. The wife testified she developed health problems, including cardiac arrhythmia, due to the stress of the marriage, and "spoke with

24

fear of [h]usband's taunting questions about what she might do when the protective order expired." *Id.* at 38.

The husband urged this Court to reverse the trial court's judgment of divorce on the grounds of cruelty or excessively vicious conduct because wife's testimony "lack[ed] sufficient specificity" and the alleged behavior "fail[ed] to reach the level of egregiousness described in some of our older cases." *Id.* at 32. The husband also contended that the wife's testimony was uncorroborated. *Id.*

We observed that, despite the more progressive definition of cruelty established in *Scheinin,* the balance of the "oft-cited cases on cruelty and excessively vicious conduct . . . . are quite old and give victims little relief from their aggressive partners by modern standards." *Id.* at 35. We explained:

> In more recent years, however, a greater awareness and intolerance of domestic violence has shifted our public policy toward allowing the dissolution of marriages with a violence element. In the courts, we have responded to this trend by permitting absolute divorce on grounds of constructive desertion, a doctrine far friendlier to victims of violence in terms of the quality of proof required to grant freedom from the shackles of an abusive spouse . . . In 1998, as part of its continuing modernization of our family law, the legislature acknowledged that persons subject to domestic abuse should be entitled to seek absolute divorce immediately without a waiting period prior to the filing of a complaint. It thus expanded the grounds for absolute divorce to include cruelty and excessively vicious conduct. John F. Fader II & Richard J. Gilbert, *Maryland Family Law* § 3-2(a)(2d ed. 1999 Cum. Supp).

> In the courts, we are now left holding a stack of cases—all "good law"— dating from the 1920's that no longer square with our modern understanding of appropriate family interaction. Verbal and physical abuse may have been tolerated in another era . . . but our values are different today.

*Id.* at 35-37.

25

Reconciling the modern statute and societal norms against the "quite old" "stack of cases," we opined that, in situations where violence has occurred and threats have been made, "as in the instant case, 'a Court of Equity should not hesitate to grant relief, especially where the facts indicate a probability that violence might be repeated.'" *Id*. at 35-36, 39 (quoting *Timanus v. Timanus*, 177 Md. 686, 687 (1940)). We held that, although the wife did not "track [the husband's] mistreatment of her in minute detail, it is clear from [her] testimony and the very existence of a protective order that Husband's conduct far exceeded mere 'sallies of passion, harshness, [and] rudeness,' and in fact threatened [the wife's] physical and emotional well-being." *Id*. at 38-39 (citations omitted). Regarding the "quality of proof needed to prove cruelty and excessively vicious behavior," we observed that the wife needed little corroboration because the "problems between the parties had long been known to the courts."[19] *Id.* at 40.

*Das v. Das* explains, not only where the law was headed following the 1998 amendments, but why a new meaning for the term "cruelty of treatment" is compelled by modern social norms. *See* Callahan and Ries, Fader's Maryland Family Law, § 4-4(h)(3).

### Defining Cruelty Today

Twenty-one years ago in *Das*, we noted that "[w]hether the events that bring a divorce complainant to court constitute cruelty or excessively vicious conduct has never been the stuff of which bright line rules are made, and even now our standards are shifting."

---

[19] In 2016, the General Assembly repealed FL § 7-101(b) which provided that "a court may not enter a decree of divorce on the uncorroborated testimony of the party who is seeking the divorce." 2016 Md. Laws, ch. 380 (H.B. 274).

26

133 Md. App. 1, 32 (2000).  Clearly, over the last nearly twenty-one years standards have continued to shift in tandem with a more comprehensive awareness of domestic violence.[20]

As the Court of Appeals observed in *Scheinin v. Scheinin*, "physical violence is no longer essential to constitute cruelty of treatment," and "[i]t is now accepted that cruelty as a cause for divorce includes any conduct on the part of the husband or wife which is calculated to seriously impair the health or permanently destroy the happiness of the other." 200 Md. 282, 289 (1952).  Building on this "more modern" definition of cruelty, this Court, in *Das,* acknowledged the damaging effects of coercive behaviors when the Court underscored husband's hitting, pinching, and pulling the wife's hair, along with his taunting questions about what wife planned to do when the protective order expired.[21] *Id.* at 38.  We also highlighted the husband's controlling behaviors, including isolating the wife from her family and friends and forcing her to account for her time in half-hour

[20] The Maryland General Assembly has continued to add protections for victims of violence. For instance, in 2014, the General Assembly altered the standard of proof by which a judge must make findings for protective and peace orders from clear and convincing evidence to a preponderance of the evidence.  2014 Md. Laws, ch. 111 (S.B. 333).  In 2017, the General Assembly repealed provisions of the Family Law Article (1) disallowing the introduction of a protective order as evidence in a divorce proceeding and (2) disallowing the court from considering compliance with a protective order as granting a decree of limited or absolute divorce.  2017 Md. Laws, ch. 490 (H.B. 293).

[21] Threats are recognized by experts as a common coercive tactic "used to keep abuse secret and to instill fear, dependence, compliance, loyalty and shame."  Evan Stark, *Looking Beyond Domestic Violence: Policing Coercive Control*, 12 J. of Police Crisis Negot. 199, 208 (2012).  Threats can include threats of harm to the victim, the abuser, and even destruction of property.  Margaret E. Johnson, *Redefining Harm, Reimagining Remedies, and Reclaiming Domestic Violence Law*, 42 U.C. Davis L. Rev. 1107, 1118 (2009).

increments.[22]  *Id*. at 38 n.26.  We concluded that it was not essential for the wife to "track [the husband's] mistreatment of her in minute detail" as long as "it [was] clear from [her] testimony" that the husband's conduct amounted to cruelty that "in fact threatened [the wife's] physical and emotional well-being."  *Id*. at 38-39 (citations omitted).

Although there are no reported cases other than *Das v. Das* that develop the definition of "cruelty of treatment" under FL § 7-103(a),[23] our decisional law recognizes that domestic abuse includes emotional abuse, psychological abuse, and other coercive and controlling behaviors.  *See, e.g.,* CJP § 10-916(b)(1) (allowing a court to hear evidence of repeated psychological abuse of a defendant when considering a defense of Battered Spouse Syndrome); *State v. Smullen*, 380 Md. 233, 253 (2004) (recognizing the clinical definition that a "battered woman" is one who is repeatedly subjected to physical or psychological behavior by her abuser in order to coerce her to do something he wants);

---

[22] Controlling tactics are used to "compel obedience indirectly by depriving victims of vital resources and support systems, exploiting them, dictating preferred choices, and micromanaging their behavior by establishing 'rules' for everyday living."  Stark, *supra*, at 210.  Isolation is used to "prevent disclosure, instill dependence, express exclusive possession, monopolize [a victim's] skills and resources, and keep them from getting help and support."  *Id*.  Other behaviors, like deprivation, exploitation, and regulation "foster dependence by depriving partners of the resources needed for autonomous decision making and independent living, exploiting their resources and capacities for personal gain and gratification, and regulating their behavior to conform with gender stereotypes."  *Id*. at 211. These tactics are often "rooted in a partner's control over basic necessities such as money, food, housing and transportation, sex, sleep, toileting and access to health care."  *Id*.

[23] A few reported cases concern divorces that were granted on the ground of cruelty of treatment, but none develop the definition of cruelty in the context of absolute divorce. *See Att'y Grievance Comm'n of Md. v. Kreamer,* 387 Md. 503, 521 (2005) (concerning whether an attorney properly pled a ground upon which an absolute divorce could be granted); *Brown v. Brown*, 195 Md. App. 72, 88 (2010) (concerning property matters involved in a divorce granted on the ground of cruelty of treatment).

28

*Flanagan v. Flanagan*, 181 Md. App. 492, 517-518 (2008) (acknowledging, in the context of constructive desertion, that a pattern of verbal abuse was behavior so demeaning to a wife's self-respect as to be intolerable).

A few years after *Das v. Das*, in *State v. Peterson*, this Court affirmed a grant of post-conviction relief to a defendant after the circuit court found that factual evidence originally available to the defense was legally sufficient to "support expert witness opinion testimony that the [defendant] was suffering from battered spouse syndrome at the time of the shooting." 158 Md. App. 558, 591 (2004). In considering the sufficiency of the evidence, we emphasized the psychological abuse suffered by the defendant. For example, the defendant's husband engaged in controlling behaviors, including regulating her behavior, and was very "possessive and jealous." *Id.* at 567. He also engaged in coercive behaviors, including "'play[ing] with her head,' [and] using tactics he had been taught in the military to 'pick on her' and on their children." *Id.* Finally, he regularly used threats and intimidation, including giving her threatening looks and threatening to kill, harm or rape her. *Id.* at. 568. We noted that, even though the physical violence appeared to stop for some years after the husband attended an alcohol rehabilitation facility, "[t]he cycle of psychological abuse—constant criticism, picking on the [defendant], and threatening her with physical harm []—continued[.]" *Id.* at 591. Although the violence was "at times physical and psychological, and at other times only psychological," we explained that such evidence offered "the requisite factual foundation of a repeated pattern of abuse" and should have been enough to "permit expert witness testimony about battered spouse syndrome." *Id.* at 592-93. We acknowledged that the defendant was "for her entire

29

marriage a victim of domestic abuse by [her husband], both physical and psychological." *Id*. at 595.

In 2017, the Court of Appeals held in *Porter v. State* that a defendant had offered enough evidence of her fear of imminent harm to entitle her to an imperfect self-defense jury instruction. 455 Md. 220, 255 (2017). The Court explained that, although the defendant may not have experienced abuse within minutes or hours of having her husband killed, because of the history of domestic violence suffered by the defendant at her husband's hands, and the cyclical nature of domestic abuse, the defendant actually believed herself to be in danger. *Id*. at 247-249. In making this determination, the Court considered evidence of the husband's escalating "physical and verbal abuse" over the months and years before the defendant had him killed. *Id*. at 227-228, 252. The evidence offered by the defendant included his controlling behaviors, such as "calling [her] at work multiple times a day to make sure she was in her office," telling her "that she should spend all of her time maintaining their household or helping him with various tasks," and isolating her from friends. *Id*. at 227. She also testified that he regularly subjected her to verbal abuse, degradation, and threats, including telling her that "she was 'worthless' and 'should die.'" *Id*. Finally, she testified to comments made by the husband about his desire to move to Florida where he threatened to feed her to the alligators, and she felt certain he would kill her. *Id*. at 227-228.

That same year, in *Wallace-Bey v. State*, we held that the trial court committed reversible error entitling the defendant to a new trial when it refused to allow her to present evidence of the actual words spoken to her by her deceased boyfriend. 234 Md. App. 501,

30

563 (2017). In that case, Wallace-Bey was a victim of physical, psychological, and emotional abuse perpetrated by her boyfriend, which led her to eventually shoot and kill him. *Id*. at 511, 519. At trial, Wallace-Bey and her expert witness attempted to offer evidence of words spoken to her by her boyfriend, including evidence of his controlling behavior and psychological abuse, but the court sustained objections to any testimony about things that the boyfriend allegedly said during the relationship. *Id*. at 523-26. Defense counsel moved for a mistrial, contending that "the exclusion of anything that [the boyfriend] had said to Wallace–Bey prevented her from presenting evidence of psychological abuse that was relevant to the issue of battered spouse syndrome." *Id*. at 525. We agreed with defense counsel. *Id*. at 511.

In determining that Wallace-Bey should have been allowed to present evidence of psychological and verbal abuse, we explained that the cycle of violence can include words in addition to actions. *Id*. at 541. Further, we reiterated that "verbal conduct can be evidence of psychological abuse." *Id*. at 542. We also held that any introduction of words spoken by the boyfriend, including evidence that the boyfriend called her an "'[un]suitable mate,'" said that she was "'tainted and flawed,'" and claimed that he was "'divinely ordained'" and "the police of God," was appropriate to illuminate the expert's opinion about psychological abuse suffered by Wallace-Bey. *Id*. at 543-44.

Based on the foregoing, it is clear that the Maryland General Assembly and the courts understand domestic abuse to encompass verbal and psychological abuse in addition to physical violence. As discussed above, amending FL § 7-103(a) was intended, in part, to "eliminate the 12-month waiting period before the victimized spouse may file a

31

complaint for absolute divorce." Senate Judicial Proceedings Committee, Bill Analysis, Senate Bill 194 (1998). The Bill Analysis specified that "[p]sychological pain or injury may also constitute cruelty." *Id.* Our cases, in turn, reflect the changing social norms and standards that recognize psychological abuse to include coercive and controlling behaviors.

Accordingly, we hold that "cruelty of treatment" as a ground for limited or absolute divorce does not require physical violence or the threat of physical violence, and may be based upon verbal and psychological abuse which "is calculated to seriously impair the health or permanently destroy the happiness of the other." *Das v. Das*, 133 Md. App. 1, 33 (2000) (quoting *Scheinin v. Scheinin,* 200 Md. 282, 289 (1952)). The evolution of our social norms, as expressed in Maryland's codified and decisional law, is reflected in this *Das*-plus formulation.

## C. Analysis

We do not discern a requirement in FL § 7-103(a)(6) that the complaining party must establish, as grounds for an absolute divorce, "more than some inciden[t]s [of cruelty] that are spread out throughout the marriage," or that the incidents of cruelty must be recent. Although these may be valid considerations for the court, we conclude that the circuit court erred on this record in denying Donna an absolute divorce based primarily on the timing of the incidents of cruelty. Overall, the trial court appears to have applied a more stringent construction of "cruelty of treatment" derived from the mostly senescent cases that were

32

cited before the court;[24] rather than the standard reflected in the more recent, and only, case published on the subject since FL § 7-103(a) was amended—*Das v. Das*, 133 Md. App. 1, 37 (2000).

It is unclear whether the court failed to consider Donna's testimony describing ongoing verbal and psychological abuse inflicted on her by Preston as grounds for divorce, or simply decided that Donna's testimony was not credible. Donna testified that, over the course of the marriage, Preston wrote her letters similar to Plaintiff's Ex. 1; regularly called her names; belittled and humiliated her; made her feel worthless; intimidated and frightened her; embarrassed her in front of others; tried to turn their son against her; refused to leave her alone with friends; and monitored her calls. Donna claimed Preston demeaned her by withholding money and support in exchange for apology notes or sex. Furthermore, Donna testified that, over the course of their marriage, she has had to beg for small amounts of money for basic necessities, and that, around the time she filed for divorce in 2017, Preston withheld financial support. Donna explained that she has not physically left the family home, despite the circumstances, because she cannot afford to do so.

Clearly, Preston disputed some of Donna's allegations, but not all. Among other things, he admitted to writing Plaintiff's Ex. 1 and reading it aloud to guests, although he claimed Donna asked him to read it. He admitted to making Donna sign the apology note entered into evidence in exchange for her car repair and to asking their son to review and

---

[24] The trial court did not cite to any cases in her ruling, but the record establishes that during oral argument, on the issue of what constitutes cruelty, counsel cited to older cases, including *Short v. Short*, 151 Md. 444 (1926); *Lemley v. Lemley*, 102 Md. App. 266 (1994); and *Bryant v. Bryant*, 16 Md. App. 186 (1972).

sign similar apology notes.  He acknowledged that he forged Donna's signature on his retirement forms after she refused to relinquish her survivor benefit, claiming that he "didn't have the means at the time to make sure all [their] bills were covered and [he] needed the full amount of [his] retirement."  And, he admitted that he and Donna have slept in separate bedrooms since 2012.

Taken together, Donna's testimony and the evidence in support thereof may be sufficient, if believed, to establish "conduct [by Preston] . . . which is calculated to seriously impair [Donna's] health or permanently destroy" her happiness.  *Das*, 133 Md. App. at 33 (quoting *Scheinin,* 200 Md. at 289).  We vacate the judgment of the circuit court and order a limited remand only to ensure that the court applies the proper standard to the evidence presented.  Evaluation of the evidence lies within the sound discretion of the trial court. *See In re Timothy F.,* 343 Md. 371, 379 (1996).  Therefore, on remand, the circuit court should determine, based on the evidentiary record already before it, whether the evidence supports the grant of an absolute or limited divorce for "cruelty of treatment" under the standard discussed in this opinion.  *See Qun Lin v. Cruz*, 247 Md. App. 606, 642 (2020) ("A limited remand is proper where the purposes of 'justice will be served by permitting further proceedings[.]'" (quoting *Funes v. State*, 469 Md. 438, 475 (2020)).  Alternatively, the circuit court may reconsider whether the evidence supports the grant of a divorce on the ground of constructive desertion, or another appropriate ground.  *See Abdullahi v. Zanini*, 241 Md. App. 372, 427-428 (2019) (explaining that it is "ultimately up to the court, based on its fact finding, to declare the grounds for divorce" and that a court is not "obligated to grant the divorce on the grounds requested when the judge is more persuaded

34

that it is more likely than not that other grounds for the divorce are more justified." (quoting *Welsh v. Welsh*, 135 Md. App. 29, 38 (2000)). We leave the circuit court with remedial flexibility to determine whether further briefing would be helpful and do not prejudge the outcome of an appeal following the circuit court's judgment.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY VACATED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID BY APPELLEE.**

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/2716s18cn.pdf